UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

_____

LILA WILSON, MATTHEW                :
MARTINO, THOMAS WILSON,             :        CASE NO: 17-cv-23033-SCOLA-TORRES
TERESA GARELLA, MARY BLUE,          :
RYAN BROWN, BRIAN MAYTUM,           :
LEIGH GLASBAND, NICK                :
PANOPOULOS, CARISSA                 :
MACCHIONE, SYDNEE                   :
JOHNSON, JORGE CRUZ, DEBBIE         :
GRAY, LORNE SPELREM, and            :
ISMAEL ORRANTIA                     :
on behalf of themselves and all others :
similarly situated,                 :
                                    :
        Plaintiffs,                 :
                                    :
            v.                      :
                                    :
VOLKSWAGEN GROUP OF                 :
AMERICA, INC. and Volkswagen AG,    :
                                    :
        Defendants.                 :
_____:

## AMENDED CLASS ACTION COMPLAINT

The Plaintiffs, based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## NATURE OF THE CLAIMS

1.      This case arises out of a life-threatening defect in the Volkswagen CC.

2.      People trust and rely on motor vehicle manufactures to make cars with reliable critical safety features to prevent clear danger of death or personal injury.

3.      Motor vehicle suspension systems are one of the critical safety features that people trust and rely on car manufacturers to make.

4.      The Defendants designed, manufactured, installed, marketed, sold, and/or distributed CC model vehicles with defective suspension components.

5.      This Action is brought on behalf of a nationwide class of owners and lessees of Volkswagen CC model vehicles who, from 2009 to the present, leased or purchased Volkswagen CC model vehicles (the "Class Vehicles").

6.      This Action is also brought on behalf of state sub-classes of owners and lessees from Arizona, California, Florida, Georgia, Louisiana, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Texas, Utah, and Virginia who, from 2009 to the present, leased or purchased Volkswagen CC model vehicles.

7.      Together, these owners and lessees of the Class Vehicles are referred to herein as the Class Members.

8.      The Defendants, Volkswagen Group of America, Inc. and Volkswagen AG ("the Defendants" or "Volkswagen"), designed, manufactured, tested, warranted, distributed, and sold the defective Volkswagen CC model vehicles from 2010 to the present.

I.      **The CC's Suspension System Is Defective**

   A.      **A Properly Designed And Functioning Suspension System Must Allow The Car To Maintain Its Proper Camber**

9.      A vehicle's suspension connects the vehicle to its wheels.

10.     A vehicle's suspension is designed to maximize and maintain the friction and contact between the tires and the road surface, to provide vehicle stability with safe handling and tire control, and to ensure the ride comfort of the passengers.

11.     Typically, a vehicle's suspension system will be designed to cause the vehicle's tires to contact the road at a specified set of angles, called alignment specifications.

12.     The primary alignment specifications are called toe, caster, and camber.

13.     Camber is the amount of angle at which the tire slants away from the vertical axis, while being viewed from the front or back of the vehicle.

14.     Vehicles that are operated with incorrect camber develop improper and accelerated tire wear, which is sometimes referred to as, among other things, tire "cupping" or "feathering."

15.     Improper and accelerated tire wear is very dangerous, because it degrades a vehicle's handling, particularly in emergency situations, such as attempts to avoid objects in the road.

16.     Volkswagen itself acknowledges this in the Owner's Manuals for the Class Vehicles, which warn that ***"[d]riving with worn or damaged tires can lead to loss of vehicle control, sudden tire failure including blowouts and sudden deflation, crashes and serious personal injuries***."  (emphasis added).

17.     Furthermore, a recent study by the National Highway Transportation Safety Administration ("NHTSA") showed that tire-related crashes were more likely when the vehicle's tire tread is worn down or degraded, which is precisely the kind of damage that the Defect presents.  The NHTSA study also stated that "inadequate tread depth can also cause blowouts of tires," which has happened to two of the named plaintiffs in this action.

18.     Properly designed and functioning suspension components should allow a technician to adjust the vehicle's camber in the event that it deviates from the manufacturer's alignment specifications, either because of normal use or because it came off the assembly line misaligned.

**B.      The CC's Suspension System Is Defective Because It Does Not Permit The CC To Maintain Proper Camber**

19.      The CC's suspension components are defective because they do not allow technicians to adjust the vehicles' front camber and do not allow sufficient adjustments to the rear camber if they deviate from Volkswagen's alignment specifications.   This Amended Complaint refers to the faulty suspension system as the "Defect."

20.      As a practical matter, all vehicles will eventually deviate from the manufacturer's alignment specifications, either as soon as they roll off the assembly line or through normal use.

21.      Thus, all CCs, either as soon as they roll off the assembly line or through normal use, develop a misaligned camber that cannot be corrected via the suspension components that Volkswagen built into the vehicles.

22.      As a result of the misaligned camber, CCs develop improper and accelerated tire wear.

23.      Simply changing the vehicles' tires will not solve the problem, because the new tires will also suffer improper and accelerated wear.

**C.      Volkswagen Has Lied To CC Drivers About The True Cause Of Their Improper And Accelerated Tire Wear**

24.      Volkswagen has offered no solution to this problem.  Instead, as discussed further below, it has instructed its dealers to cover up the problem by telling CC drivers that the improper and accelerated tire wear that they have suffered was caused by, for example, erratic driving or bad tires, rather than the Defect, and that the only solution is to repeatedly replace prematurely worn tires.

25.      Volkswagen's instructions to its dealers are knowingly false. In fact, the improper and accelerated tire wear on CC vehicles is caused by the Defect.

26.     In addition, although there are permanent fixes for the Defect, Volkswagen has refused to publicize or authorize them and, as a result, Volkswagen dealers refuse to disclose these fixes to CC drivers or to perform the necessary repairs.

27.     For example, one permanent solution to the defect is to remove the CCs' existing control arm assemblies and replace them with different control arm assemblies that allow for sufficient adjustments to the vehicles' camber.

28.     Adequate aftermarket control arm assemblies currently exist and have existed on the market and could have been used by VW dealers to make this repair on the Class Vehicles.

29.     Volkswagen knows of the existence of the adequate aftermarket parts. Nevertheless, Volkswagen has refused to issue any bulletins to its authorized dealers explaining this repair or to authorize the repair for at least two reasons.

30.     First, Volkswagen has not acknowledged the Defect and the methods for repairing it because doing so would acknowledge that the CC's existing suspension system is defective.

31.     Second, Volkswagen's express warranty requires Volkswagen to pay for the replacement of defective parts and workmanship and thus would cover the cost of the repairs necessary to permanently fix the Defect. But the warranty does not cover tire wear or driver error. Thus, by refusing to acknowledge that the improper and accelerated tire wear is caused by the Defect, Volkswagen has also avoided its contractual obligation to pay for the necessary repairs.

32.     Rather than acknowledge the Defect, Volkswagen continues to order its dealers to defraud CC drivers by telling them that the appropriate repair is to repeatedly replace the vehicles' tires, which is not, in fact, an adequate fix because it does not actually correct the underlying problem with the vehicles' suspension systems.

33.     Since at least 2010, Volkswagen knew or should have known that the Class Vehicles are defective, that they suffer from the Defect, and that they are not fit for their intended purpose of providing consumers with safe and reliable transportation.  Nevertheless, Volkswagen actively concealed this safety defect and failed to disclose it either to the Plaintiffs or to the Class Members.

34.     Volkswagen concealed the Defect from the public while continuing to advertise its products as safe and reliable, showing a blatant disregard for public welfare and safety. Moreover, Volkswagen violated its affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

35.     Volkswagen also failed to warn the Plaintiffs and the Class Members about the Defect.  In fact, even during the Class Vehicles' warranty period, Volkswagen refused to correct or pay for the damage caused by the Defect.

36.     Had the Plaintiffs and the other Class Members known about the Defect at the time of lease or purchase, they would not have bought or leased the Class Vehicles or, at the very least, they would have paid less for the Class Vehicles.

37.     Prior to leasing or, as the case may be, purchasing the Class Vehicles, the Plaintiffs and the other Class Members did not know that the Class Vehicles suffered from the Defect and did not contemplate that the tires on the Class Vehicles would have to be replaced repeatedly and well in advance of their expected tread life. Nor were they aware that they would have to continue changing the Class Vehicles' tires repeatedly over the entire life of the vehicles.

38.     As a result of the Defect, coupled with Volkswagen's omissions and misrepresentations with respect to that Defect, the Plaintiffs and the Class Members have suffered an ascertainable loss of money (in the form of extra payments for degraded tires they have had to replace), a significant diminution in the value (including the resale value) of their Class Vehicles, and did not receive the benefit of their bargain.

## THE PARTIES

39.     Lila Wilson is a Florida citizen who resides at 1773 Skyline Lane, Sebastian, FL 32958.

40.     Matthew Martino is a New Jersey citizen who resides at 20 Rutgers Avenue, Berkeley Heights, NJ 07922.

41.     Thomas Wilson is a Texas resident who resides at 7131 Cypress Prairie Drive Cypress, TX 77433.

42.     Teresa Garella is a Pennsylvania resident who resides at 1243 Snee Drive Pittsburgh, PA 15236.

43.     Mary Blue is a Missouri resident who resides at 145 Brackleigh Lane Florissant, MO 63031.

44.     Ryan Brown is a North Carolina resident who resides at 105 Zircon Lane Knightdale, NC 27545.

45.     Brian Maytum is a California resident who resides at 4866 St. Augustine Drive Elk Grove, CA 95758.

46.     Leigh Glasband is a Georgia resident who resides at 1515 Range Heights Terrace Loganville, GA 30052.

47.     Nick Panopoulos is an Ohio resident who resides at 1813 Westview Drive NE Warren, OH 44483.

48.     Carissa Macchione is a New York resident who resides at 23 Aspen Road, Kings Park, NY 11755.

49.     Sydnee Johnson is a Virginia resident who resides at 10402 Twin Knoll Way, Upper Malboro, MD 20772.

50.     Jorge Cruz is a Texas resident who resides at 4901 Bridgewood Drive, Kaline, TX 76549.

51.     Debbie Gray is a Louisiana resident who resides at 2228 Halsey Avenue, New Orleans, LA 70114.

52.     Lorne Spelrem is an Arizona resident who resides at 2250 East Deer Valley Road, Unit 30, Phoenix, AZ 85024.

53.     Ismael Orrantia is a Utah resident who resides at 11289 Sandy Dunes, Sandy, UT 84094.

54.     The Defendant, Volkswagen Group of America, Inc., is a New Jersey corporation with its headquarters and principal place of business in Herndon, Virginia.

55.     The Defendant, Volkswagen AG, is a German corporation and the parent company of Volkswagen Group of American, Inc. Its headquarters and principle place of business are in Wolfsburg, Germany. The two Defendants are herein referred to collectively in this Amended Complaint as "Volkswagen" or "Defendants" unless otherwise specified.

## JURISDICTION AND VENUE

56.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different

from the Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

57.     This Court has personal jurisdiction over the Plaintiffs because the Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Volkswagen, pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6), because it conducts substantial business in this District; some of the conduct giving rise to the Amended Complaint took place in this District; and some of the Plaintiffs' claims arise out of the Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of the Defendants' acts and omissions outside this state; and at or about the time of such injuries, Volkswagen was engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Volkswagen anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

58.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, the Defendants have caused harm to Class Members residing in this District, and the Defendants are residents of this District under 28 U.S.C. § 1391(c)(2), because they are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

59.     The Plaintiffs bring this Action on behalf of themselves and a class of similarly-situated consumers who have purchased or leased the Class Vehicles with the Defect. The Defect endangers the lives of the Class Vehicles' occupants and other drivers, imposes substantial costs

and inconvenience on vehicle owners and lessees who must repeatedly replace the Vehicles' tires, and negatively affects the resale value of the Class Vehicles.

**I.**     <u>**The Plaintiffs**</u>

    **Lila Wilson (Florida):**

60.     On or about October 22, 2011, Lila Wilson purchased a new 2012 Volkswagen CC sport sedan from a Volkswagen dealership located at 1416 S. Harbor City Blvd., Melbourne, Florida 32901.

61.     Ms. Wilson is retired and has driven approximately 3,500 miles per year on her CC vehicle.

62.     Ms. Wilson's CC suffers from the Defect, and it has suffered from the Defect from the moment the car was manufactured.

63.     Within the first year of purchasing the CC, Ms. Wilson noticed that there was an issue with loud road noise.

64.     On numerous occasions within her first three years of owning the car, Ms. Wilson drove 30-40 miles to the Volkswagen dealership in Melbourne, Florida, and specifically complained about the road noise.

65.     The Volkswagen dealership in Melbourne, Florida, repeatedly looked at the car in response to Ms. Wilson's concerns and told her that there was nothing wrong with the car.

66.     The dealership failed to mention the Defect, even though it acknowledged the excessive and premature amount of wear and tear on the vehicle's tires.

67.     Upon information and belief, the Volkswagen dealership in Melbourne, Florida, reported Ms. Wilson's complaints about her CC to Volkswagen, but Volkswagen actively concealed the Defect by advising the dealership that there was no defect. Instead, Volkswagen

advised the dealership to tell Ms. Wilson that the road noise and tire wear were simply a non-defective design attribute of her "sports car."

68.     Finally, after driving approximately 16,000 miles on the vehicle—and after repeatedly receiving false assurances from Volkswagen--Ms. Wilson took the car to a private mechanic near her home.

69.     In or about December 2016, the mechanic told Ms. Wilson that her tires were excessively worn down and cupped, and that the premature wear and cupping were related to problems with the design of the car.

70.     Ms. Wilson replaced all four tires on her vehicle for a cost of approximately $500-700 with alignment and balancing.

**Matthew Martino (New Jersey):**

71.     On or about June 22, 2012, Matthew Martino leased a new 2013 Volkswagen CC Sport from a Volkswagen car dealership located at 118 Morristown Road, Bernardsville, New Jersey 07924.

72.     Mr. Martino's CC suffers from the Defect, and it has suffered from the Defect from the moment the car was manufactured.

73.     In August 2013, Mr. Martino brought his CC to the Volkswagen dealership where he bought it for its 30,000 mile service.  At that service visit, the dealership noted that the inside of the front left tire on the CC was completely worn, and that the back rear tire was worn and cupped.  The dealership recommended that Mr. Martino pay for two new tires and an alignment.

74.     Mr. Martino asked the dealership about the cause of the wear and cupping and was told that it was likely caused by "rim damage."  Mr. Martino questioned the explanation as he did not notice any damage to his rims.

11

75.     Mr. Martino also asked the dealership whether the issues with the worn and cupped tires was covered by his warranty. The dealership told Mr. Martino that the warranty did not cover the issue.

76.     Mr. Martino brought his car back in for service at the dealership again in April 2014.  This time, the dealership noted that all four tires were worn and cupped and needed to be replaced.

77.     Mr. Martino again asked about the cause of the tire wear and cupping and about the warranty.  The dealership again said that the issue was likely related to "rim damage" and that it was not covered by the warranty.

78.     In December 2014, Mr. Martino brought his car to Firestone to replace the brakes. At this visit, Firestone informed Mr. Martino that all four tires were again cupped and worn and needed to be replaced.

79.     Mr. Martino asked Firestone about the potential cause of the tire wear and cupping issue. Firestone told Mr. Martino that the issue was caused by a defect in the vehicle's suspension design.  Mr. Martino asked whether "rim damage" could cause the tire wear and cupping. Firestone answered that the wear and cupping was not the result of "rim damage."

80.     In June 2015, Mr. Martino attempted to surrender his vehicle to Volkswagen, but Volkswagen refused to accept it.  In so refusing, Volkswagen's representatives explained that they would not accept the vehicle because, once again, it needed new tires and wheels.

81.     In November 2015, Mr. Martino brought the car back to the Volkswagen dealership.  The dealership again noted that two of his tires needed to be replaced.  Mr. Martino specifically asked the dealership if there was a problem with the design of the vehicle's suspension. The dealership answered that there was no such problem.

82.     The dealership suggested that Mr. Martino replace the struts and mounts on his front left and rear tires.  He took the car to Firestone, which replaced the struts and mounts on his rear tires.  Nonetheless, in February 2016 and then in January 2017, Mr. Martino had to replace a total of six more tires—all prematurely worn and cupped—because of the Defect.

83.     In January 2017, Mr. Martino brought his CC to a Volkswagen dealership in Flemington, New Jersey.  He specifically asked the dealership if the problems he was experiencing with his tires could be caused by the setting on the car's camber or a defective suspension design, and he was told that the problems were not caused by an defect in the car.

84.     Since the start of his lease, Mr. Martino has had to replace all four of his vehicle's tires on at least four separate occasions because of the Defect.

85.     Each tire replacement cost Mr. Martino approximately $800-$1000 with alignment and balancing.

86.     Upon information and belief, the Volkswagen dealership in New Jersey reported Mr. Martino's complaints about his CC to Volkswagen, but Volkswagen actively concealed the Defect by advising the dealership that there was no defect and by prompting the dealership to tell Mr. Martino that there was no defect.

**Thomas Wilson (Texas):**

87.     In or about February 2012, Thomas Wilson purchased a new 2012 Volkswagen CC LT from a Volkswagen dealership located at 17113 Katy Freeway, Houston, Texas 77094.

88.     Mr. Wilson's CC suffers from the Defect, and it has suffered from the Defect from the moment the car was manufactured.

89.     Mr. Wilson took his CC to the Volkswagen dealership where it was purchased for its 10,000-mile service.  At that service visit, the Volkswagen dealership informed Mr. Wilson

that the front tires on the vehicle were cupped and needed to be replaced.  The dealership also told Mr. Wilson that the vehicle needed to be realigned.

90.     Mr. Wilson asked if the recommended repairs were covered by his warranty.  The dealership told him that the repairs were not covered by his warranty because the tire wear and cupping were considered "wear and tear" and not defects.

91.     Mr. Wilson then went to a separate auto service provider to get his tires aligned and replaced because the quote this service provider gave Mr. Wilson was significantly lower than the price the Volkswagen dealership had given him.

92.     Since purchasing the car, Mr. Wilson has had to replace all four tires of his vehicle on four separate occasions because of the Defect.  Each replacement cost approximately $500-700 with alignment and balancing.

93.     Earlier this year, Mr. Wilson took his car to have the tires replaced and aligned at a non-Volkswagen service provider.  That provider told Mr. Wilson that the tire wear and cupping issues he was experiencing were common to the CC and that the service provider sees those issues with the CC all the time.

94.     After hearing this, Mr. Wilson went back to the Volkswagen dealership and told the service manager there about what the other service provider had said about the CC.  The Volkswagen service manager told Mr. Wilson that there was nothing wrong with the CC and that issues related to the CC's tires were a result of Mr. Wilson not maintaining the vehicle properly.

95.     Upon information and belief, the Volkswagen dealership in Texas reported Mr. Wilson's complaints about his CC to Volkswagen, but Volkswagen actively concealed the Defect by advising the dealership that there was no defect and by prompting the dealership to tell Mr. Wilson that there was no defect.

14

**Teresa Garella (Pennsylvania):**

96.     On or about March 24, 2014, Teresa Garella purchased a new 2014 Volkswagen CC from a Volkswagen car dealership located at 3694 Washington Rd., McMurray, Pennsylvania 15317.

97.     Ms. Garella's CC suffers from the Defect, and it has suffered from the Defect from the moment the car was manufactured.

98.     Within her first 8,000 miles with the CC, Ms. Garella noticed that the CC emitted loud road noise.

99.     On March 15, 2016, Ms. Garella brought her CC to the Volkswagen dealership in McMurray, Pennsylvania, for an inspection.

100.    The inspection revealed that the car "may require attention in the near future" related to its "tire wear pattern and tread depth."

101.    The Volkswagen dealership never told Ms. Garella about the Defect.

102.    On March 4, 2017, Ms. Garella brought her CC to the same Volkswagen dealership for another inspection.

103.    This time, the car failed inspection because of the tread depth and tire wear issues.

104.    Ms. Garella had to have all four tires replaced on her CC on March 11, 2017, because of the failed inspection and the Defect.  The mileage on her CC at the time was only 13,954 miles.  The replacement tires cost Ms. Garella around $700-800 with alignment and balancing.

105.    Upon information and belief, the Volkswagen dealership in Pennsylvania reported Ms. Garella's complaints about her CC to Volkswagen, but Volkswagen actively concealed the

Defect by advising the dealership that there was no defect and by prompting the dealership to tell Ms. Garella that there was no defect.

**Mary Blue (Missouri):**

106.    In or about April 2014, Mary Blue purchased a 2012 Volkswagen CC at an auto dealership in Missouri.

107.    The vehicle had approximately 28,000 miles on it at the time of purchase and came equipped with brand new tires.

108.    Ms. Blue's CC suffers from the Defect, and it has suffered from the Defect from the moment that the car was manufactured.

109.    In March 2015, just one year after purchasing the vehicle, Ms. Blue had to have all four tires on her CC replaced because the tires were unevenly worn and cupped.  But, because Ms. Blue could not afford to buy all four the tires at the same time, she replaced two in March at a cost of approximately $300 and two more in July at a cost of $470 (with alignment).

110.    In February 2017, all four of the tires on Ms. Blue's CC were unevenly worn and cupped.  She again replaced all four tires at an approximate cost of $650.

**Ryan Brown (North Carolina):**

111.    In or about November 2015, Ryan Brown purchased a 2010 Volkswagen CC at an auto dealership located at 2900 N. Main St., Fuquay-Varina, North Carolina 27526.

112.    The vehicle had approximately 78,000 miles on it at the time of purchase and came equipped with brand-new tires.

113.    Mr. Brown's CC suffers from the Defect, and it has suffered from the Defect from the moment the car was manufactured.

114.    In November 2016, just one year after purchasing the vehicle and with only about 13,000 miles on the tires, Mr. Brown had to have all four tires replaced on his vehicle due to the Defect at a cost of $500-700 with alignment and balancing.

115.    The mileage on the vehicle at the time of the first tire replacement was 91,393. Just 14,000 miles later, in approximately October 2017, Mr. Brown had to have all four tires replaced again because they were worn and cupped.  The cost for the tires was approximately $290.

116.    In October 2017, Mr. Brown took the car to a Volkswagen dealership in North Carolina to have the car realigned.  Mr. Brown asked the dealership why he repeatedly needed to replace his tires due to wearing and cupping, and he was told that the uneven wear and cupping was due to an aggressive sports suspension set-up.  The Volkswagen dealership never disclosed the defect to Mr. Brown.

117.    Upon information and belief, the Volkswagen dealership in North Carolina reported Mr. Brown's complaints about his CC to Volkswagen, but Volkswagen actively concealed the Defect by advising the dealership that there was no Defect and by prompting the dealership to tell Mr. Brown that there was no defect.

**Nick Panopoulos (Ohio):**

118.    On or about September 14, 2011, Nick Panopoulos purchased a new 2012 Volkswagen CC Turbo from a Volkswagen dealership located at 7850 Market St., Boardman, Ohio 44512.

119.    Mr. Panopoulos' CC suffers from the Defect, and it has suffered from the Defect from the moment the car was manufactured.

120.    Approximately six months after he purchased the car, Mr. Panopoulos brought his CC back to the dealership to have the tires rotated.  After the tires were rotated were rotated, Mr. Panopoulos began noticing a loud noise emanating from the tires whenever he was driving.

121.    In or about August 2012, the car had approximately 12,000 miles on it. Mr. Panopoulos brought the car back to the Volkswagen dealership and complained about the noise. The dealership noted that the tires were worn unevenly and cupped.  Mr. Panopoulos asked the dealership to explain why the tires were worn unevenly and cupped, and the dealership said that the car was out of alignment. The dealership also said that there was no other cause for the uneven wear or cupping.  The dealership never mentioned the Defect.

122.    The dealership realigned the car and rotated the tires and charged Mr. Panopoulos for those services.  The realignment and tire rotation did not solve the problem.  Mr. Panopoulos continued to experience loud noise emanating from the tires while driving.

123.    He returned to the dealership and complained once again about the loud noise. The dealership once again realigned the car.  It also replaced the tires with new tires and charged Mr. Panopoulos again for those services.  Mr. Panopoulos again asked about the cause of the uneven wear and cupping, but the dealership continued to represent that there was nothing wrong with the car.

124.    Instead, the dealership suggested that it was Mr. Panopoulos' driving that was causing the uneven wear and cupping.  Mr. Panopoulos is 86 years old, has been driving since 1950, and has never received a speeding ticket.

125.    As of this writing, Mr. Panopoulos' vehicle has approximately 60,000 miles on it. Since the time of his purchase, Mr. Panopoulos has had to have all four tires replaced on his

vehicle four times, generally after approximately 15,000 miles each time, due to the Defect, at a cost of approximately $500-700 each time (with alignment and balancing).

126.    The dealership never mentioned the Defect to Mr. Panopoulos, even though it acknowledged the excessive amount of wear and tear on the vehicle's tires.

127.    Upon information and belief, the Volkswagen dealership in Boardman reported Mr. Panopoulos' complaints about his CC to Volkswagen, but Volkswagen actively concealed the Defect by advising the dealership that there was no defect, by prompting the dealership to tell Mr. Panopoulos that there was no defect, and to blame the uneven wear and cupping on Mr. Panopoulos.

**Brian Maytum (California):**

128.    In July 2015, Brian Maytum purchased a certified pre-owned 2014 Volkswagen CC R-Line from a Volkswagen dealership located at 9776 W. Stockton Blvd. Suite 2, Elk Grove, California 95757.

129.    At the time Mr. Maytum purchased the vehicle, it had approximately 8,000 miles on it and was well within the warranty.

130.    Mr. Maytum's CC suffers from the Defect, and it has suffered from the Defect from the moment the car was manufactured.

131.    In March 2016, Mr. Maytum brought his car to the dealership where he purchased it for a 20,000 mile service.  The car had approximately 18,000 miles on it at the time of the service.  At the service, the dealership initially rotated the tires. But, after noting that the tires were "feathering" and making excessive noise, the dealership rotated them back to their original position.  The dealership never disclosed the Defect to Mr. Maytum.

132.    In December 2016, Mr. Maytum brought his car to a different Volkswagen dealership in California to perform a 30,000 mile service.  The CC had approximately 28,000 miles on it at the time of this service.

133.    This dealership noted that all four tires were cupped on the inside.  The dealership rotated the tires.  The car was "howling" and extremely noisy after the rotation.  Mr. Maytum returned to the very same dealership five days later to complain about the noise he was experiencing while driving.

134.    The dealership told Mr. Maytum that the issues he was experiencing with his CC were common among CC's and that the dealership had seen those same issues pop up frequently with other CC's.  Shortly thereafter, in or about May 2017, Mr. Maytum had to have all four tires replaced on his vehicle due to the Defect at a total cost of about $1,000 with alignment and balancing.

135.    Upon information and belief, the Volkswagen dealerships in California reported Mr. Maytum's complaints about his CC to Volkswagen, but Volkswagen actively concealed the Defect by advising the dealerships that there was no defect.

**Leigh Glasband (Georgia):**

136.    In or about May 2016, Leigh Glasband purchased a used 2013 Volkswagen CC in Lawrenceville, Georgia.

137.    At the time of purchase, the vehicle had approximately 55,000 miles on it. As of this writing, the vehicle has approximately 80,000 miles on it.

138.    Mr. Glasband's CC suffers from the Defect, and it has suffered from the Defect from the moment the car was manufactured.

139.     Prior to purchasing the car, Mr. Glasband brought the CC for an inspection at a Volkswagen dealership located at 3500 Stone Mountain Hwy, Snellville, Georgia 30078.   Mr. Glasband brought the car to a Volkswagen dealership for the specific purpose of ensuring that it was free of defects before he purchased it.

140.     The Volkswagen dealership told Mr. Glasband there was nothing wrong with the car except that it needed an alignment and two new front tires.  The dealership told him that the car would be fine once these tasks were done.  The dealership never disclosed the Defect to Mr. Glasband.

141.     Mr. Glasband purchased the car after the Volkswagen dealership's inspection and based on its representations.  Because of the dealership's recommendation, Mr. Glasband also had the car aligned and purchased two new front tires.

142.     About three or four months later, Mr. Glasband brought the car into a service provider because the car was vibrating and pulling to one side while he was driving.  The service provider noted that all four tires needed to be replaced because they were unevenly worn and cupped.  Mr. Glasband paid approximately $400 or $500 to replace the rear tires.  He did not replace the front tires because they had been replaced three months earlier.

143.     Since the time of purchase, in approximately 25,000 miles of driving, Mr. Glasband has had to have all four tires on the vehicle replaced on two separate occasions because of the Defect at a cost of $500-700 each time, with alignment and balancing.

**Carissa Macchione (New York):**

144.     On or about January 22, 2014, Carissa Macchione leased a new 2014 Volkswagen CC R-Line model from a Volkswagen dealership located at 838 East Jericho Turnpike, Huntington Station, New York 11746.

145.    Ms. Macchione's CC suffered from the Defect, and it has suffered from the Defect from the moment the car was manufactured.

146.    On or about October 26, 2016Ms. Macchione surrendered her CC to the same Volkswagen dealership where she purchased the car.

147.    As a result of the Defect, Ms. Macchione had to pay for several tire replacements and suffered several tire blow-outs during her lease period.

148.    Specifically, on March 6, 2015, a tire blew out on Ms. Macchione's CC while she was driving.  She was driving no more than 15 miles per hour when the blow-out occurred.  The blow-out was caused by the Defect.

149.    On July 22, 2015, another tire blew out on Ms. Macchione's CC while she was driving on a busy road.  She was driving no more than 15 miles per hour when the blow-out occurred.  The blow out was caused by the Defect.

150.    On November 15, 2015, another tire blew out on Ms. Macchione's CC while she was driving on the New Jersey interstate.  She was driving at or below the speed limit when this blow-out occurred.  The blow-out was caused by the Defect.

151.    On September 20, 2016, a tire blew out on Ms. Macchione's CC while she was driving on the New Jersey interstate.  She was driving at or below the speed limit when this blow-out occurred.  The blow-out was caused by the Defect.

152.    Because of the Defect, Ms. Macchione has spent approximately $800 to $900 for replacement tires on her CC.

153.    Ms. Macchione called the Volkswagen dealership where she bought the car after both the first and second tire blow-outs in 2015.  She spoke to the service manager and asked if

there was anything wrong with the car.  She specifically referenced online complaints about tire issues related to the CC.

154.    The dealership failed to mention the Defect.   Instead, the service manager at the dealership falsely told her that there was nothing wrong with the design of the car, and that the blow-outs were happening because the CC is a "low-lying vehicle."

155.    Upon information and belief, the Volkswagen dealership in New York reported Ms. Macchione's complaints about her CC to Volkswagen, but Volkswagen actively concealed the Defect by advising the dealership that there was no defect, by prompting the dealership to tell Ms. Macchione that there was no defect, and by telling the dealership to advise Ms. Macchione that the tire blow-outs and the uneven tire wear and cupping were the result of a non-defective design attribute of her CC.

156.    On August 7, 2017, Ms. Macchione sent a letter directly to Consumer Services for Defendant Volkswagen Group of America, Inc. In the letter, Ms. Macchione described, among other things, the issues she had experienced with the uneven tire wear, the tire cupping, and the tire blow-outs on her CC.

**Sydnee Johnson (Virginia):**

157.    In April 2011, Sydnee Johnson purchased a new 2011 Volkswagen CC Sport from a Volkswagen dealership located at 8433 Leesburg Pike, Vienna, Virginia 22182.

158.    Ms. Johnson's CC suffers from the Defect, and it has suffered from the Defect from the moment the car was manufactured.

159.    Approximately six months after the purchase, Ms. Johnson brought her car to the Volkswagen dealership where she had bought it for an oil change.   During that visit, the

23

dealership noted that all four of her tires needed to be replaced because the insides of her tires were completely bald.

160.     Ms. Johnson asked the dealership how she could possibly need new tires after only six months of driving. The dealership answered that the tire issues were caused by the way Ms. Johnson was "braking."  The dealership never mentioned the Defect.  The dealership told Ms. Johnson that the new tires were not a part of her warranty package, and added that she had to pay $1,000 for the new tires.

161.     Ms. Johnson has had to have the tires replaced on her CC about every six to eight months..   Except for the initial replacement done by the dealership, she has had all the replacements done at Firestone because Firestone's prices for the tires are lower and because the dealership had told her that the tires were not covered by her warranty.

162.     In December 2016, the back right side tire on Ms. Johnson's CC blew out while her husband was driving on a busy road.  She had just replaced the tires three months earlier. Ms. Johnson's husband was driving at a safe speed and in a safe manner at the time of the blow-out. The tire blow-out was caused by the Defect.

163.     Upon information and belief, the Volkswagen dealership in Virginia reported Ms. Johnson's complaints about her CC to Volkswagen, but Volkswagen actively concealed the Defect by advising the dealership that there was no defect and by prompting the dealership to tell Ms. Johnson that there was no defect.

**Jorge Cruz (Texas):**

164.     In February 2015, Jorge Cruz purchased a new 2013 Volkswagen CC Sport from a Volkswagen dealership located at 3221 E Central Texas Expressway, Killeen, Texas 76543.

165.    Mr. Cruz's CC suffers from the Defect, and it has suffered from the Defect from the moment the car was manufactured.

166.    In February 2015, Mr. Cruz was in the U.S. Army and was stationed at Fort Hood, Texas.   To ensure the safety and welfare of its personnel, the U.S. Army performs regular inspections of vehicles owned by U.S. Army personnel.   Approximately six months after Mr. Cruz purchased the CC, the Army's mechanics inspected the CC and noticed that the tires had been completely worn down.

167.    Because the tires were so worn down, the CC failed the Army's inspection. As a result, the Army ordered Mr. Cruz to buy new tires. In doing so, the Army explained that the state of Mr. Cruz's tires presented a serious safety hazard.

168.    Mr. Cruz then went to a local service provider and paid to have all four tires replaced on his vehicle.   The service provider told Mr. Cruz that his tires were worn out unevenly and cupped. Mr. Cruz paid approximately $1,000 to have all four tires replaced.   The vehicle had approximately 1,000 miles on it at the time of the tire replacement.

169.    About eight months later, in approximately March or April 2016, Mr. Cruz was driving in the rain when he attempted to stop his car. As he pressed on the brakes, the car slid approximately ten feet, even though Mr. Cruz was driving carefully and within the speed limit. Feeling unsafe, Mr. Cruz took the car to the nearest mechanic he could find.   The mechanic told Mr. Cruz that his CC's two front tires were, again, completely bald.   At the time, the car had approximately 9,000 miles on it.   The mechanic rotated the rear tires to the front and put two new tires in the rear at a cost of $150.

170.    Mr. Cruz was deployed to Afghanistan from April 2016 through January 2017. After being back for only two months, in or about March 2017, Mr. Cruz had to replace all four

tires again at a cost of approximately $800. These changes were necessary because of the uneven tire wear and cupping that, as before, were caused by the Defect.

171.    After the March 2017 tire change, Mr. Cruz went to the Volkswagen dealership where he purchased the car and asked why his tires were repeatedly worn out and cupped.  He was told that the reason his tires were worn out and cupped so frequently was because the CC was a "sports car." Mr. Cruz also asked about the warranty and was told that the car was not covered by his warranty because "tires are not part of the warranty."

172.    Upon information and belief, the Volkswagen dealership in Texas reported Mr. Cruz's complaints about his CC to Volkswagen, but Volkswagen actively concealed the Defect by advising the dealership that there was no defect and by prompting the dealership to tell Mr. Cruz that there was no defect.

**Debbie Gray (Louisiana):**

173.    On or about March 16, 2012, Debbie Gray purchased a new 2012 CC from a Volkswagen dealership located at 13940 Airline Hwy, Baton Rouge, Louisiana 70817.

174.    Ms. Gray's CC suffers from the Defect, and it has suffered from the Defect from the moment the car was manufactured.

175.    On October 2, 2014, Ms. Gray brought her CC to a Volkswagen dealership in Metairie, Louisiana.  She brought the car into the dealership because the car had for some time been making a very loud noise when she was driving at normal speeds.  The dealership told Ms. Gray that her tires were unevenly worn and cupped and that she needed four new tires.

176.    Ms. Gray had all four tires replaced and had the car aligned for a cost of approximately $1,000.  Volkswagen never told Ms. Gray about the Defect.

177.    In or about September 2015, Ms. Gray brought the car in to be serviced at another Volkswagen dealership.  During that service visit, the dealership again told Ms. Gray that she needed to replace two of her tires.  She asked the dealership how that could be possible since she had replaced all four of her tires less than one year earlier.

178.    The Volkswagen dealership recommended that she bring the car back to the dealership in Metairie that had previously replaced all four tires.  When Ms. Gray brought her CC to the dealership in Metairie, that dealership likewise recommended that she replace two of the tires. Based on this representation, Ms. Gray agreed to the replacement at a cost of $233. Neither dealership ever told Ms. Gray about the Defect.

179.    On September 8, 2016, Ms. Gray took her car to Firestone. Firestone advised Ms. Gray that all four of her tires were unevenly worn and cupped and that all four tires had to be replaced again.  Ms. Gray agreed to have all four tires replaced at a cost of approximately $700.

180.    Upon information and belief, the Volkswagen dealerships in Louisiana reported Ms. Gray's complaints about her CC to Volkswagen, but Volkswagen actively concealed the Defect by advising the dealerships that there was no defect and by prompting the dealerships to tell Ms. Gray that there was no defect.

**Lorne Spelrem (Arizona):**

181.    In or about February 2013, Lorne Spelrem purchased a certified pre-owned 2012 Volkswagen CC from a Volkswagen dealership located at 8801 W Bell Rd, Peoria, Arizona 85382.

182.    At the time of the purchase, the vehicle had approximately 35,000 miles on it and still had its full remaining factory warranty.

183.    Mr. Spelrem's CC suffers from the Defect, and it has suffered from the Defect from the moment the car was manufactured.

184.    After about one year, in which Mr. Spelrem drove the vehicle approximately 15,000 miles, the CC's two rear tires were unevenly worn and cupped.  Mr. Spelrem went to a service provider and had the two rear tires replaced at a cost of approximately $400.

185.    Then, in April 2015, with approximately 75,000 miles on the car, Mr. Spelrem had to replace all four of the CC's tires because they were, again, unevenly worn and cupped. The replacement tires cost Mr. Spelrem approximately $900.

186.    The car currently has approximately 108,000 miles on it and all four tires are again unevenly worn and cupped. Mr. Spelrem will have to spend another $900-$1,000 to replace them.

187.    Mr. Spelrem recently went to a Volkswagen dealership in Tucson. Mr. Spelrem informed the dealership of the uneven wear and cupping on his CC's tires and asked what might be causing the issue.  The dealership told him that there was nothing wrong with the car. Importantly, the dealership did not disclose the Defect to Mr. Spelrem.

188.    Upon information and belief, the Volkswagen dealership in Arizona reported Mr. Spelrem's complaint about his CC to Volkswagen, but Volkswagen actively concealed the Defect by advising the dealership that there was no defect and by prompting the dealership to tell Mr. Spelrem that there was no defect.

**Ismael Orrantia (Utah):**

189.    In or about October 2015, Ismael Orrantia leased a new 2015 Volkswagen CC Sport Sedan from a Volkswagen dealership located 1070 Main St, Salt Lake City, Utah 84101.

190.    Mr. Orrantia's CC suffers from the Defect, and it has suffered from the Defect from the moment the car was manufactured.

191.    Approximately one year after Mr. Orrantia leased his CC, all four tires on the CC were unevenly worn and cupped.  At the time, the CC had approximately 11,000 miles on it. Because of the Defect, Mr. Orrantia had all four tires on his car replaced and had the car aligned at an approximate cost of $800.

192.    In November 2017, Mr. Orrantia brought his car to the Volkswagen dealership where he leased it for its 30,000 mile service.  During this visit, the dealership informed Mr. Orrantia that all four of his tires were unevenly worn and cupped again.  At the time, the car had approximately 27,500 miles on it.

193.    The Volkswagen dealership told Mr. Orrantia that his car was out of alignment and that it needed new tires. The dealership never disclosed the Defect to Mr. Orrantia.  Instead, the dealership suggested that Mr. Orrantia purchase new tires at the dealership.  Mr. Orrantia declined the offer and decided that he would have the tires replaced at a tire shop.

194.    Upon information and belief, the Volkswagen dealership in Utah reported Mr. Orrantia's complaint about his CC to Volkswagen, but Volkswagen actively concealed the Defect by advising the dealership that there was no defect and by prompting the dealership to tell Mr. Orrantia that there was no defect.

195.    The named Plaintiffs are not the only victims of the Defect. Some fifty-thousand Americans have purchased or leased the Class Vehicles over the last seven years. Each of these approximately fifty-thousand vehicles likewise suffers from the very same Defect—a defect that has nothing to do with the manner in which the vehicle is driven, the terrain on which the vehicle is taken, or the tires with which the vehicle is equipped.

II.  **Volkswagen Knew About the Defect**

196.    As explained below, Volkswagen received notice of the Defect from at least five different sources.

A.  **Volkswagen Learned of the Tire Problems Almost Immediately Through Its Supervision of Volkswagen Dealerships**

197.    Pursuant to Volkswagen's warranty agreements, CC owners must take their vehicles to authorized Volkswagen dealerships in order to have any repairs covered by their warranties.

198.    In addition, regardless of whether a particular repair or service is covered by a warranty, many CC drivers take their vehicles to authorized Volkswagen dealerships for repair and service because both Volkswagen and the dealerships claim that the authorized dealerships are particularly skilled and experienced at servicing, diagnosing, and repairing Volkswagen vehicles.

199.    For example, Volkswagen's website claims that local Volkswagen dealerships have the "best minds in the business"; that "[n]obody knows your car better than our Volkswagen Certified Technicians"; and that the owners and lessees of Volkswagen vehicles should "[g]o with the[se] pros[.]"

200.    Upon information and belief, beginning at least in 2010, CC drivers began taking their cars to authorized Volkswagen dealerships to complain about improper and accelerated tire wear.

201.    Upon information and belief, from 2010 to the present, thousands of CC drivers have taken their cars to Volkswagen dealerships because they were suffering improper and accelerated tire wear.

202.    Indeed, beginning in 2011, thirteen of the class representatives in this case complained to authorized Volkswagen dealerships that their CCs were suffering improper and accelerated tire wear.  In addition, as discussed below, numerous posts on internet message boards and complaints to NHTSA beginning around the same time offer further evidence of the tremendous number of complaints about premature tire wear and tire cupping that CC drivers were making—and have continued to make—to Volkswagen dealers.

203.    Through its close supervision of Volkswagen dealerships, Volkswagen itself learned of these complaints almost immediately.

### 1. The Dealerships Told Volkswagen Regional Service Representatives About the Problems

204.    Volkswagen employs regional service representatives that oversee approximately 10-12 dealerships in a defined geographic area. These regional service representatives are in regular contact with the service departments of authorized Volkswagen dealerships.

205.    Upon receiving a consumer complaint about improper and accelerated tire wear on a CC, Volkswagen dealerships routinely contact their Volkswagen regional service representatives via e-mail or phone to report the problem for at least two reasons.

206.    First, the Volkswagen regional service representatives could authorize the dealer to temporarily address the problem by offering to replace the consumer's tires at no cost.

207.    Second, the Volkswagen regional service representatives were a main point of contact for Volkswagen dealerships to learn about potential fixes for any issues that arose with Volkswagen vehicles.

208.    Accordingly, upon information and belief, beginning at least as early as 2010, Volkswagen regional service representatives learned from Volkswagen dealerships that an inordinate number of CC drivers were suffering from improper and accelerated  tire wear.

### 2. Volkswagen Learned of the Problem Through Its Own Maintenance Records

209. In addition, every time any repair is conducted at a Volkswagen dealership, a technician enters a repair order into a database maintained by and accessible to Volkswagen.

210. Each repair order contains, among other things, a description of the customer's complaint, the car's current mileage, and a description of the repair, if any, that the dealership performed.

211. Upon information and belief, beginning at least by 2010, Volkswagen dealerships began entering repair orders related to CCs that had suffered improper and accelerated tire wear.

212. Thus, Volkswagen also learned of the Defect through the repair orders entered in its own databases, which showed a shockingly high rate of improper and accelerated tire wear.

### B. Volkswagen Learned of the Defect from CC Owners Who Complained Directly to It

213. Because Volkswagen's website and its warranty directed CC owners to bring all problems to Volkswagen dealerships, most CC drivers complained to the dealerships about the improper and accelerated tire wear.

214. But consumers also complained directly to Volkswagen.

215. For example, in a 2016 complaint to NHTSA, one CC driver explained that his or her CC had suffered improper and accelerated tire wear at less than 15,000 miles and that, in addition to complaining to the dealership, had complained to Volkswagen itself, and included the Volkswagen case number assigned to his or her case. The complainant also stated that Volkswagen refused to "furnish how many similar issues were reported by [other] consumers."

216. Because Volkswagen continues to keep secret the volume of complaints it has received about improper and accelerated tire wear on the CC, the Plaintiffs cannot know for

32

certain how many CC drivers have complained directly to Volkswagen. But upon information and belief, Volkswagen may have received hundreds or thousands of direct complaints about the issue.

### C. Volkswagen Learned of the Defect Through Complaints to NHTSA

217.    NHTSA maintains a publicly accessible database of consumer complaints about motor vehicles.

218.    The database is searchable by make, model, and year.

219.    Upon information and belief, auto manufacturers, including Volkswagen, monitor the NHTSA database and review complaints about their vehicles.

220.    By at least 2013, customers were filing complaints with NHTSA about the CC's serious problems with improper and accelerated tire wear. What follows is just a sampling of the common, nationwide complaints about the Defect that appear on NHTSA's database:

   a.  August 15, 2013 – "For the fourth time I have gone to get my car checked out, and the problem isn't getting resolved. There's a constant rattling, that makes the car seemed unbalanced of sorts. Also my tires are getting used up, very rapidly as little as 2-3 months. They say they know what the problem is, but still my car needs to be brought in for the same thing."

   b.  September 6, 2013 – "Back in September of 2012 was told I needed a new tire (bubble in tire) at only 15,000 miles. Replaced tire at 208.00 dollars. July of 2013 had my 20,000 mileage service and was told another tire had a bubble and needed new tire. New tire purchased at 208.00 and also had my inspection sticker done at the same time; all tires passed inspection. On my way home from this service noticed my car was riding rough and a vibrating noise. Brought the car back at

dealership (all services listed done at fathers & son) two weeks after my July new tire purchase and was told O needed two more new tires, same problem bubbles inside and outside tires. Had no choice because of safety reasons and had to purchase two more new tires for a total of 416.00 dollars. I have owned numerous cars and have never had to replace any tires even though I keep my cars for at least five years, but low mileage. I was told it was my driving habits so I decided to go on the internet to research these tires and was appalled on how many complaints and unsatisfied consumers with almost all the same problem I had. Please check into these tires as to my knowledge are very unsafe and could cause a serious accident if these tires rupture because of the bubbles. To this date I had to replace all four tires with current mileage of 22,668."

c.  October 22, 2014 – "The contact owns a 2013 Volkswagen CC. The contact stated that the tires rubbed against the vehicle abnormally. The vehicle was taken to a dealer where the tires were replaced but the failure persisted. The manufacturer was notified of the failure. the approximate failure mileage was 11,891."

d.  April 27, 2015 – "Volkswagen CC has significant problems with poor tire wear, cupping. I was told by service department that Volkswagen has a European alignment that 'toes in'? for handling. The tires wear poor. They replaced one tire that was in really bad shape and I purchased another. Soon after the other two tires did the same thing. The tire company Dobbs in St. Louis told me that the Volkswagen alignment causes bad wear. Volkswagen says the alignment is fine."

e. June 9, 2015 – "Purchased this car new. started experiencing shuddering and grinding sensation from the front end of car when in motion. It is especially bad at lower speeds. The dealership claims to have checked the brakes and suspension of the car and found nothing wrong. However, they found that my tires are cupping and that is causing the problem. I am fearful to drive this car at highway speeds. I believe a tire or suspension failure is imminent."

f. September 15, 2015 – "The contact owns a 2013 Volkswagen CC equipped with continental Conti Pro Contact tires, size: 235/40r 18/95h (NA). While driving 40 mph, an abnormally loud noise emitted from the front tires. The contact stated that the failure became progressively worse, with road noise entering the vehicle every time it was utilized. The vehicle was taken to the dealer where it was diagnosed that all the tires were out of round and were cupping. The tires were not replaced. the tires were the original equipment. the manufacturer was made aware of the failure. The approximate vehicle and tire failure mileage was 17,000."

g. December 13, 2015 – "I purchased the vehicle 12/12 as a demo with 5k miles on it. The tires aroud [sic] 9,000 miles were worn so uneven I just couldn't take it anymore. After going back and forth with dealer they agreed that they would pay for 3 tires if I would pay for one. I did it and though I would be doing great with my new Michelin Pilot Sport AS3, but since the last rotation I feel like I am driving a train (ruh, ruh. ruh. ruh). I am going to bring up the negative camber issue that many many people complaine [sic] about and see if there is a permanent fix. In my and many other peoples opinion this car is perfect minus this. I would think by now they would have come clean and issued a recall of some sort."

h.  April 6, 2016 – "Inherent alignment and suspension design flaw causes cupping of tires at frequent intervals despite exceeding manufacturers recommended cycle for tire rotation and alignment checks. The problem has been acknowledged by the dealer but there is no solution from the manufacturer to fix this issue. Owners nationwide seem to have the same problem which translates to an annual tire replacement expense. Even with best rated tires that are supposed to last 60,000 miles, the most mileage one can achieve is about 15,000. The result also includes noisy driving conditions, vibration while braking or accelerating. Keeping the alignment within factory spec does not resolve the issue. VW should look into the design and modify the alignment and suspension to help consumers with this frustrating problem."

i.  April 27, 2016 – "2013 Volkswagen CC equipped with Continental Conti Pro Contact tires. While driving at all speeds, an abnormally loud noise emitted from the tires. The vehicle had less than 15000 miles on the tires when the problem began. The road noise got progressively worse and eventually took the car to the dealer. The dealer stated that the problem is due to cupping of the tires and that I would need to replace the tires and get a realignment. The car has been serviced on a regular basis through the dealer and the dealer did not mention any issues with alignment during the services. Other owners had provided similar issues on the internet and that the issue had not resolved after both new tires and realignment in many cases. The issue seems to be related to bad alignment or ball joints in the suspension with the vehicle. I placed a complaint with VW and they

would not furnish how many similar issues were reported by the consumers. VW case# 160380592."

j.  August 31, 2016 – "I have a 2013 Volkswagen CC, right now it has only 23,000 miles and the tires are cracking so badly, the car was in service on 2014 which pretty brand new, I want DOT to re certified [sic] this tire make sure it pass [sic] DOT standard. I will submit images upon request."

k.  October 27, 2017 – "I have replace [sic] two set of tires on my 2013 Volkswagen CC. I twice by two different vehicle maintenance copies that both set of tires showed cupping wear. This is due to vehicle suspension, shocks, struts. Currently there a large number of customers who purchase the Volkswagen CC model complaining of the same problem. there was also an apparent lawsuit file (case 1:17-cv-23033-rns), against Volkswagen of America regarding the same issue many customers are having. I filed a complaint with Volkswagen of America regarding my problem, stating that in the pass [sic] couple of years I had to replace two set of tires for this reason. Tire cupping can be very dangerous due to uneven tire ware [sic], not to mention the suspension being the main problem of the vehicle. Improper suspension could lead to dangerous breaking issues. After reading the many reviews from customers complaining about the same issue, and reporting this issue to Volkswagen to no avail since 2010. I'm asking NNTSA to please investigate this dangerous issue that Volkswagen is not admitting to. I have included the court document that was filed in August of 2017."

l.  September 18, 2017 – "Tires constantly suffer from cupping."

### D. Volkswagen Learned of the Defect Through Complaints on Online Message Boards

221.    Vehicle owners often publicly disclose complaints about their vehicles on online fora and message boards.

222.    Upon information and belief, auto manufacturers, including Volkswagen, monitor online message boards and forums to learn about problems with their vehicles, including, in particular, message boards devoted to their specific cars.

223.    At least by 2011, CC drivers began to post complaints about the problems of improper and accelerated tire wear that were afflicting their CC vehicles on online fora and message boards, including fora and message boards devoted specifically to Volkswagen vehicles:

   a.  July 4, 2011 – "I have a 2012 VW CC Sport that I had cupping all around at 14000 miles. Contacted VW Customer Care and they went half on a new set of Conti DWS I love the tires but now I have 28500 miles on the vehicle (about 14000 miles on these new tires) and I have the same cupping issue again. The car was aligned prior to installation of the new rubber. My son has a 2009 VW CC VR6 and he is now on his second set of Yokohama Avids with cupping issues. *There is definity [sic] something wrong with the design. Shouldn't have to replace the tires every year.*" (emphasis added).

   b.  December 11, 2011 – "My tires are wearing on the inside, with only 20k mi. Had alignment checked, it was in specs. *VWOA has agreed to split the cost of new tires. Tires were very noisy.*"  (emphasis added).

   c.  December 29, 2012 – "Im right there with you, I think its a design flaw too. Ive had this car since new and road noise has been big issue. Now the tires cupping

on top of it, Cmon man!! This car should ride a lot better than it does especially what I paid for it. My 36000 mile warranty has ran out so the stealership will tell me to take a hike if I complain again to them."

d.  May 7, 2013 – I have a 2012.VW CC. At 14000 miles I had tire cupping on all four wheels. (OEM.Conti tires). Replaced tires and aligned. Another 14000 miles later I have the same problem again. VW sends me to Conti but friends with the same car and different tires have the same problem. Still not fixed. Contacted VW customer service several times and the problem is still not resolved. (emphasis added). There is something wrong with the suspension, not the tires. Don't know what else I have to do to make them understand there is a problem with this model car."

e.  May 13, 2013 – "I bought a CPO 2012 CC Sport 2 months ago and an having the same issue. The car had under 15k miles on it when I bought it. At 17k miles I started getting a thumpimg [sic] noise. Dealership said all four tires were cupping. Said they weren't responsible for tires and referred me to Continental. Continental said they are fighting with VW about this issue and that it is a design issue with the car and not the tires. They also told me to rotate the tires every 5k miles, not the 10k miles VW recommends in the owner's manual. They replaced all four tires at no charge. Now less than 1,500 miles later the noise has returned. Cupped tires again. Either the stock tires are the worst tires ever made or this car has a major flaw with the suspension/alignment. There are tons of posts on VW owner forums and blogs about this and no one really has the actual cause. Some say it's the tires, some say it's the car. Either way we are getting screwed."

f.   May 19, 2013 – "I recently bought a CPO 2012 CC Sport with 14k miles on it. Around 17k miles I had cupping on all four tires. Dealership wouldn't do anything because tires aren't covered. I spoke with a Service Manager at Continental and he told me that they have been fighting with VW about this for a while. He said they are trying to get VW to change the rotation interval to 6k miles instead of the 10k miles they have in the owner's manual. Conti replaced all four tires as a "one time exception". Now, about 2k miles later, the problem is back....I have asked VW to take the car back. I don't think that will ever happen but I want my case well documented. I'm even going to look into New Jersey Lemon Law to see if I can take action. To me it seems like the problem is with the car. I say this because so many people who have reported this problem and changed tire brands have had the problem again."

g.   June 8, 2013 – "I have a 2010 CC. Loved the car but had the same problem with tires. All 4 tires began cupping by about 12,000 miles. Dealer said it is a design issue that randomly affects this model. So I drove my car with a thumping noise for another two years and 16k miles. Eventually had to replace all tires. What a dissappointment [sic] because a really liked everything else about it."

h.   July 30, 2013 – "I have 2013 VW CC and it also has same issue, brought my car for 10K oil change and they rotate the tires and its downhill from there. The tire noise is unbelievable, went back to the dealer and they told me its normal and the noise will go away after I drive it for 2000 miles. 2000 miles pass by, came back to them and the tire noise is getting worse and they said it needs to be 5000 miles. Drive it for 3000 miles and noise is still there. Called VW factory and they went

ahead and instructed me to bring it to the dealer and they request all 4 tires changed. (emphasis added). Dealer stated all 4 tires cupped. At first I thought it was only 1 damage tire but instead its all 4 tires. The dealer have a notice at service desk stating cupped tires is caused by suspension. When I asked them, they said that is not the caused of the problem, what is the caused of the problem then? I don't want to keep changing my 4 tires every 10K miles just like some of these people here having the same problem. Unbelievable."

i.  August 29, 2013 – "Have a 2009 third set of tires! Still same problem CUPPING. Not buying VW again, I just replaced these tires in Dec 2012, and it is Aug 2013 and the same problem. And yet VW gets away with it. Third Set!"

j.  November 18, 2013 – "I have a 2010 VW CC and I have the same problem that I've read other people are experiencing. I'm currently on my second set of tires and the dealership said that they have no idea what's causing the cupping. I love the car but it's time to get rid of my VW."

k.  November 20, 2013 – "Here's my story, it should help you feel vindicated: Tires cupped badly, VW agreed to replace tires at 20K service and then they cupped again within 8K miles. I wrote a letter to the CEO and I am not sure it even reached the CEO because I was contacted by a Katie Fox. I had tons of issues with their customer care people and that's why I wrote the letter. They wouldn't admit the REAL PROBLEM IS THE CARS SUSPENSION. Well, they ended up sending their regional ASE certified Master Technician to work on my car who stated VW KNOWS about this issue and the engineers are trying to fix the car AFTER I had been told several times by the customer care team they blame the

tires! (emphasis added). I replaced the original tires with a completely different tire the 1st time and the issue was just as bad, IT IS NOT THE TIRES AND I SAY THIS TO HELP THOSE WHO ARE BEING MISS LED BY VW! I believe I may be one person who managed to take this as far as it can go, I received a lovely $2000 check towards another VW. Unfortunately when they do that your current cars information is all over the letter, VIN# and all! If you want to trade out of your car you then need to hand this letter to the dealer your trading it into and explain why you have compensation for the vehicle your trading, how humiliating is that? Completely uncomfortable position to put your customer in and $2000 towards another VW does not even begin to make up for all the trouble, time and heart ache I have experienced with this car in just 30,000 miles! It has been a noisy obnoxious ride for all but 5000 miles of the 30,000 miles I have driven it over 2.5 years:( They couldn't even admit it was not the tires but the car, so many other people are going through the same experience and being told its the tires even after they have completely different tires and have the same issue. I threw the voucher away and bought another car, I will never buy VW again and my whole family are VW owners. They have completely lost me and my family as customers for life."

l.  November 26, 2013 – "2011 CC Sport tires are all cupped by 17,000. Tire rotation made the noise worse. Called Continental Tires...nothing. Called VW Care and they act like they never heard of the problem before. (emphasis added). Very expensive problem on the care owner. No more VW's."

m. November 27, 2013 – "Have a 2013 cc, after 10k rotation noticed tire/road noise. Returned to dealer, said regular noise. At 16k had another VW dealer check out problem, was told I needed new tires due to excessive tire chop. Called VW USA with issue, long story short, they will replace Conti tires with Goodyear with no guarantee it wouldn't happen again. (emphasis added). Was not told if it was a tire or car problem. Very concerned."

n. December 4, 2014 – "I purchased my 2010 CC with around 18k miles. Car had the original Continental tires that were in good shape. I had the tires rotated and balanced every 2k miles. At about 22 thousand miles the tires began making terrible noise. Front end shop indicated no alignment problems, tire shop said that they were cupping. I decided that I could no longer stand the noise, and sprang for new Michelins. To my chagrin, the Michelins ( 225.00 X4 ) did the same thing. The tire company gracefully exchanged these for another set of low profile tires (Michelins). After about 15k on my newest Michelins I am experiencing the same noise and worse. Tire shop says that these tires are cupping and no explanation as the car goes down the highway strait as a string. I finally called the VW dealership and the service advisor told me that the 2010-2013 had a rear axel that caused this! This car is (which I love other than the tire problems) is making me crazy. If VW knows about this problem, why have they not done anything. Can you say class action?"

o. March 24, 2015 – [Facebook communication to Volkswagen's official Facebook page from Chris D'Souza]

> **D'Souza**: "My 2nd VW CC R Line with cupping issues. My friend Cyrille Mahfoud, now has this issue on his CC too. My 4th

consecutive VW lease and my LAST. The noise from the tires is horrendous. VW blames contiental tires and continental tires blames VW. Thanks for nothing. If you search the web you will find many VW owners with this problem, this is just one site."

**VW Response**: "Hello Chris, thanks for your feedback. Have you already contacted our colleagues from customer service in the USA? You can reach them via phone 001-800 822-8987 or e-mail volktalk@vw.com by stating your name and contact details as well as your vehicle identification number. We wish you all the best.""

**D'Souza**: "Yes. They blamed the tires. Put me in contact with Continental tires and they blame the car's suspension. Unofficially two dealerships said it is the suspension. Wrote a certified letter to VW in Jan and received no response."

**Volkswagen Response**: "Hi Chris, we can imagine that this is unsatifying [sic] for you. Please be sure, that we do our best to help our customers finding an appropriate solution if they are having an issue. Unfortunately, we cannot do more for you here on the international facebook page. In order to get your issue clarified, we recommend that you <u>get</u> in touch with our colleagues customer care in the United States again."

p.  April 4, 2015 – "Have 2010 CC and have replaced tires 3 times already because of cupping and noise! Looking for a tire that will work this time!! Suggestions?"

q.  March 2, 2016 – "2014 vw cc rline back tired cupped at 19,000 miles put a claim into contentinal tire and vw waiting to hear resolution. Dealer is just pacifying me states car needs alignment when contentinal acknowledges it's a suspension design problem with the cc....alignment is in tacit....no more vw's for me!!!!!"

r.  March 12, 2016 – "I have the same issue with a 2012 CC. The tires are cupping on the inner front tires. I had them rotated and realigned and now the car sounds horrible and the ride is not smooth. VW told me that is what happens when you rotate the tires. Sorry! I think not. How many people on this site have a 2012 CC

with the same issues? If there is an emission problem, there could be an alignment

defect as well."

s.  March 18, 2016 – "Same issue. 2013 VW CC. Gone through 2 sets of tires and

the dealer (Cook VW in Bel Air MD) acknowledges it's a problem with the CC

suspension. I will NEVER buy another VW I don't care how 'good' the deal is."

t.  August 22, 2016 – "i have replaced all 4 tires 3 times on my cc and it only has

50,000 miles on it. bunch of *** ......"

u.  "I purchased a brand new 2013 vw cc sport back in August 2012. At 11, 897

miles (Dec 2013) I was told my four tires were chopped or cupped. I was advised

that this happens because the tires need to be rotated every 5000 miles NOT

10,000 like the warranty book explains. Since there is literally NO documentation

anywhere stating so, someone (other than myself) was going to replace these tire

free. I contacted VW consumer complaints directly and they opened a claim with

Continental Tires. (emphasis added). Result-on Dec 23, 2013 ALL 4 tires were

replaced with Continental tires-paid partially by Continental and partially by VW.

GREAT...so I thought. WRONG!! In May of 2014, at 17,001 miles tires were

rotated and no notation of cupping or wearing by dealership. Fast forward to Sept

2014, with 20,191 miles take car in for 20, 000 manufacture scheduled

maintenance: oil change and tire rotation. Service technician notates REAR

TIRES CHOPPED. REAR TIRES TREAD 5/32, 6/32 FRONT TIRES TREAD

8/32. ARE YOU SERIOUS. CRAP...NOT AGAIN. You're telling me with 4

brand new Continental tires put on in just 8 months and 19 days ago AND 8,294

miles driven with 1 tire rotation I should be told my tires are chopped/cupped.

REALLY? Volkswagen sounds like you have a CLASS ACTION SUIT on your hands. THIS IS CLEARLY NOT RIGHT. There is a manufacture defect causing these tires to wear unevenly or these tires are made with cheap, soft rubber. Whatever the case, I will be contacting the Florida Lemon Law Department and I will forward this information at a class action attorney for review. After searching causes of tire wear online, I see I'm not alone. This is wrong and unjust to consumers. Fortunately, I'm able to take this further. I feel sorry for the consumer who has/had to pay out of pocket for this FLAW. I hope this helps anyone else with the same problem."

v.   "Second CC, had an '09 with same exact issue at 15,000 miles. Continental's that VW puts on the CC's are garbage. Replaced both the '09's and '13's tires with Michelin Primacy MXM4's. Be prepared for this to cost you some money, just under $1,000 for all 4 tires plus a 4-wheel alignment. Complained to the dealership (who blamed Continental), VW Corporate office (who also blamed Continental - but yet continues to put the tires on their cars) and Continental (who blamed VW for bad front ends). (emphasis added). As you can see, you will go round and round and get absolutely no answers from anyone. Honestly I don't care who the problem lays with, I just want the problem fixed - I didn't realize that we can't admit problems as large corporations! LOL"

w.   "I too purchased a new 2013 cc and started experiencing the tire noise immediately. I was told that since the car had been sitting for a few months that it would go away after driving it for a while. I drove the car for 10k miles, took it in for service and was told I needed an alignment which, I'd have to pay for. I was

46

later told by a tire company, because I didn't believe the dealer, that I needed four new tires and an alignment because they had worn so badly. I took the car back to the dealer, contacted Volkswagen (corporation) argued my case and they agreed to replace 3 of the tires and the dealer agreed to replace the 4th. (emphasis added). My car now has 36,500 miles on it and I'm still having the same issues."

x.  "I bought CC '13 last November, and I got the 10k service. The dealer's service advisor called me that my tires were worn unevenly, so he recommended the wheel alignment. I did. After return, I had severe tire noise on highway, and I checked a local store to see what happens. We found inside shoulders in front tires were extremly [sic] cupped. Likely, one pitch rises and the next pitch falls all over the shoulder. I put the vehicle to the service again, and the same guy told "mm there's a little noise from front tires, and you would need to contact the tire manufacture because the dealer has nothing to do with this" So I went to the tire dealer-Continental authorized- and the manager of tire dealer told, wheel alignment is out of spec, so this should not be covered by conti due to mechanical problem. Then I raised this issue to VW customer care, and one rep offered me he would cover 3tires if I pay 1 tire. I had price quote from the same dealer, and learned ~$250 installation charge for 4 tires.. I went back to the rep about this, and he has told my installation charge will be covered after he spoke to the dealer. (emphasis added). I got back to the dealer, heck, the tire price is increased and the installation charge is $100 ($25/tire). I am tired and sure it is 'a shame' in the name of VW. I decided to sell CC, since I know I would face this kind of situation again time to time."

y.  "Cupping issue with tires, dealer never rotated tires at 10k service or at 20k service (South Charlotte VW), advised i needed an alignment, figured out tires was not rotated during 20k mile service due to repaired front tire was still in front. Took back and they advised they didn't rotate due to cupping (well thanks for sharing that with the customer...which they didn't of course). Contacted VW America and they paid to replace two of the four tires at 21k miles (fixed the noise since new tires were placed in front), took to rotate at 26k miles and now tires in rear have cupped and the car is loud again. (emphasis added). Also paid for an alignment at 20k service, which at that point tires were already ruined. Was advised at the 26k service to rotate tires (Hendrick VW Concord) that the CC's are the heaviest vehicle which causes the camber alignment to cup the tires and because of this issue owners of this vehicle will deal with cupping tires, was informed to rotate more frequently than the recommended 10k service interval (every 3-5kmiles) but this will not keep tires from cupping and causing the noise and at some point tires will have to be replaced to get rid of the loud noise. What's difficult is they expect us to foot the bill for this issue...how rude and inconsiderate when this was not disclosed up front to the consumer upon purchasing the vehicle. That the buyer would be financially responsible for replacing tires to prevent loud noise caused by the cars camber alignment. Just awful!! We have been in contact with VW America again to see how they will address this issue."

z.  "All 4 tires cupping on inside tread. The rears were twice as bad as the front. Bought the car used with 16000. *VW dealer offered to replace and I pay half of*

48

*the expense for the new tires and they would align for free. I agreed but let them know I was aware of the issue with the CC and would demand free replacement if it happens again. They said they are aware also and have contacted VW about the same issue.*" (emphasis added).

aa. "Volkswagen CC Sport w/LED Lighting Package purchased brand NEW. Initial maintenance service at 12 mo. mark w/7,400 miles so they did 10,000 mi. service maintenance. Brought car in at 13,000 miles for coolant leak, coolant pump REPLACED, and 20,000 mi. service maintenance was performed 3 mos. early when they rotated tires. Loud, loud tire noise increased. Drove 1,150 more miles, brought into dealer. Discount Tire said all 4 tires were worn on inside, severely cupped. My VW maintenance service receipt never indicated they rotated tires at 10,000 mi. service maintenance. *Dealer contacted VW. They offered to replace 3 out of 4 tires!* (emphasis added). They wanted $600 for one tire, an alignment, mounting, some incidentals. Some posts I read claim it's not the tires, but the front end alignment of the car that can't be changed (?) Car depreciation excessive for 23 months, 14,900 miles. GOT RID OF CAR and bought another BRAND! Beware."

bb. "I have had this problem since I had the first servicing on the car. I bought the Executive Sedan with 6,000 miles on it. Each time I have had it serviced at the dealership they gave me similar feedback:

- it's the tires

- problem with the design of the car so turn up the radio so you don't have to hear it I replaced 1 of the tires at 20,000 miles and now at 26,500 they all need

49

replacing. I sent the dealership this thread showing a problem with the CC and their response was to sell me a new car OR take it up with VW Corporate. Does anyone know about a class action? If so, please post here and let's all keep giving VW an earful. Also - it helps to give the dealership a low rating. If enough of us do this, the dealers will insist VW do something. Given VW's history of misleading the public I would not be surprised if one is already in process. I want a refund on the entire car."

cc. "At 30,000 miles brought car in for front end noise. I was told the car was fine. Tires were great they DID NOT RECOMMEND ROTATING THEM. At 33,000 miles car is back at dealership. Noise is now a vibration. Tires are chopped. The dealership put on different tires and let me drive it before I trusted that the tires were the problem. I spoke to everyone at the dealership from service managers to general managers. Everyone promised, gave their word that new tires and an alignment will fix the problem for good. But after reading this post I have decided to move along and get rid of this car before I am here again. I was told the car was made for the autobahn and is just sensitive. Ahhhhhh, not sure anyone would take a basic Jetta on the autobahn....  *I will contact corporate and make myself a nuisance.* (emphasis added). When I pick car up today I'll be sure to tell GM why I won't purchase the Toureg. It's probably too sensitive too....."

dd. "Took my 2013 cc in for oil change & tire rotation at the recommended 10,000 miles, after that the tires made a horrible noise. It only got worse from there. You have to have the radio at half volume to drown out the noise at city speeds, and its much worse at freeway speeds. Dealer says it's how the cars alignment is set up,

for performance with negative camber in the front. (Which is what causes premature uneven wear on the inside portion of the tread.) And that if I want the noise to stop I will need to purchase four new tires. That would only make sense if you get a new alignment because you will just destroy your new tires. (But nice try to the dealer for thinking I was dumb enough to fall for that.) So I asked them to re-align the car and omit the negative camber. But that is not possible because the camber is not adjustable in the front. So I was told by my dealer that if I can't stand the noise I will have to replace my tires every 12,000 miles and rotate them every 3,000 miles. Really VW?? If this is what VW has to offer in their $35,000 sedans, count me out. I'll never buy another one!"

ee.  "I have the same issue with the tires being cupped. The dealer said that it was due to alignment issues and that I should get new tires and then perform an alignment. After reading this thread, it seems like a broader issue with the car itself. *I will be contacting VW customer service.*" (emphasis added).

ff.  "The same issue for me..!! since my first 10,000 Miles service, I had an extreme noisy ride.. went back to the dealer and I was advised that simply this is the suspension system of this car and that I have to rotate the tires every 5000 MILES or replace them at my own cost! also they will charge me 170$ for the alignment! So VW dealer is admitting that the issue causing this noise is the car suspension system and wants to charge for alignment and tire replacement!! I am riding a $37K car that drives like a junk car.. Completely unsatisfied and waiting to get out of this lease.. Will never advise anyone to buy/lease a VW CC..."

51

gg. "Same problem with the Continental tire cuppling and making noise. We just purchase [sic] the car, so we took it to dealer Norm Reeves VW, Irvine CA, and they said it is very common on CC since body of the car is heavy so interior side of tires get cuppled therefore make noise, but they said "You will get used to it and if not you have radio to listen to". Really?!?! Nothing was done at this dealer."

hh. "Original set of Conti tires cupping badly with tons of road noise. Like other posts, VW blames Continental and Continental blames VW. At 23,000 miles those tires with plenty of tread were junked. VW gave me a couple hundred bucks towards the purchase of new tires. Hardly the cost of replacement. Now the new tires are making the same chopping noise after 12,000 miles. Obviously VW has an engineering flaw with that suspension set-up. But Germans don't generally admit to engineering flaws. The local dealer doesn't seem to take a stand either. Can't wait until this things [sic] comes off lease in a few months. Time to order my Tesla."

ii. "Dealer said this is a common problem and that it will go away after 12k miles and it hasn't. Unfortunately, this was my dream car but I can't stand to drive it for another 7+ with this problem. I will be taking it back to the dealer to investigate other car options."

jj. "Significant cupping of continental tires requiring complete new set of Michelins plus alignment. Got the dealer to pay for two of the four tires. Now with alignment done at every oil change 7500 miles the noise has reappeared at 42000.

> The Michelins which have only 23000 miles are cupped now too. Trying to get Michelin to adjust and VW to get the alignment right."

kk. "Was told I had cupping on all four tires. Followed required maintenance as needed. Alignment required every 10k and new tires very 30K can be very expensive."

224.    At least by 2010, then, Volkswagen learned, from all of the sources discussed above, about the improper and accelerated tire wear on the CC and knew that this wear was caused by the Defect.  Despite knowing about the Defect, Volkswagen failed to disclose it either to the Plaintiffs or to any other Class Member.

225.    Instead, Volkswagen has actively concealed the Defect and has continued to manufacture, distribute, and sell the Class Vehicles with the Defect.

226.    As a result of the Defect and Volkswagen's efforts to conceal the Defect, the Plaintiffs and the Class Members have been harmed and have suffered damages.  Specifically, the Plaintiffs and the Class Members: (1) have been placed (and will continue to be placed at a significantly increased risk of physical injury or death resulting from a tire-related crash or accident; (2) have incurred (and will continue to incur) substantial out-of-pocket costs relating to the maintenance, repair, and replacement of the prematurely worn and degraded tires; (3) have suffered (and will continue to suffer) a significant diminution in the overall and resale value of their vehicles; and (4) did not receive the benefit of their bargain, as the value of the vehicle as delivered was less than the value of the vehicle as promised.

## III.    Volkswagen Made Material Misstatements and Omissions to CC Buyers

227.    Volkswagen provided each CC buyer with an Owner's Manual that purported to provide instructions on how best to care for and maintain the Class Vehicles.

228.    The Owner's Manuals contain a series of misleading statements and omissions that concealed the Defect from CC Buyers.  Specifically, the Owner's Manuals instructed buyers to have work related to the CC's "tire and wheels" or "suspension" or "alignment" done only at authorized Volkswagen dealers or service facilities because these dealerships purportedly had the specialized knowledge and tools that would be necessary to make proper repairs on the Class Vehicles. For example, the Owner's Manuals provide, in pertinent part, as follows:

- "Volkswagen recommends that all work on tires and wheels be done by an authorized Volkswagen dealer or authorized Volkswagen Service Facility.  They are familiar with the technical requirements and recommended procedures, have the necessary special tools and spare parts, and can properly dispose of old tires."

- "The tires must be checked immediately for **_hidden damage_** by an authorized Volkswagen dealer or an authorized Volkswagen Service Facility."   (emphasis in original)

- "Volkswagen recommends that you have your tires rotated by an authorized Volkswagen dealer or authorized Volkswagen Service Facility."

- "If you experience increased tire wear under normal driving conditions, have the vehicle suspension checked by an authorized Volkswagen dealer or an authorized Volkswagen Service Facility."

- "Incorrect wheel alignment causes excessive an uneven tire wear, impairing vehicle safety.  If you notice excessive or uneven tire wear, have the wheel alignment checked by an authorized Volkswagen dealer or an authorized Volkswagen Service Facility."

- "Have repairs and vehicle modifications performed by an authorized Volkswagen dealer or an authorized Volkswagen Service Facility."

229.    These statements were materially misleading because they:

- Dupe CC drivers into believing that Volkswagen authorized dealers and service facilities are best suited to fix suspension problems like the Defect, when, in fact, they would not do so, despite there being aftermarket parts that would correct the problem; and

- Fail to disclose that Volkswagen had instructed its authorized dealers and service facilities to cover up the true cause of CC drivers' improper and accelerated tire wear by falsely blaming it on causes other than the Defect.

230.    The warranty booklets Volkswagen caused to be provided to all CC buyers also contain a series of misleading statements and omissions that concealed the Defect from CC owners.

231.    To begin with, like the Owner's Manuals, the warranty booklets urge CC owners to take their vehicles only to authorized Volkswagen dealers because, they said, only the dealerships are sufficiently concerned about their customers' "satisfaction and goodwill" and only the dealerships are in the "best position to quickly resolve any concerns." In pertinent part, the warranty booklets provide as follows:

> If you have questions about your vehicle or the service you have received, we suggest that you first discuss them with the service personnel at your authorized Volkswagen dealer.  You may want to speak to the Service Manager or directly to the owner of the dealership.
>
> It is their business to be concerned about your satisfaction and goodwill.  Because they are closest to the situation, they are in the best position to quickly resolve any concerns you may have.  (*See, e.g.*, Model Year 2010 USA Warranty and Maintenance Booklet at 17.)

232.    The warranty booklets also state that:

- Volkswagen dealers have "Volkswagen trained technicians, proper workshop equipment and parts to give you expert service"; and

- "Volkswagen dealers are committed to quality service."  (*See, e.g.*, Model Year 2010 USA Warranty and Maintenance Booklet at 26.)

233.    Like the Owner's Manual, the foregoing statements in the warranty booklets are materially misleading because they:

- Dupe CC drivers into believing that Volkswagen authorized dealers and service facilities are best suited to fix suspension problems like the Defect, when, in fact, they would not do so, despite there being aftermarket parts that would correct the problem; and

- Fail to disclose that Volkswagen had instructed its authorized dealers and service facilities to cover up the true cause of CC drivers' improper and accelerated tire wear by falsely blaming it on causes other than the Defect.

234.    The warranty booklet also falsely states that the New Vehicle Limited Warranty ("NVLW") "will be honored by any authorized Volkswagen dealer in the United States, including its territories." *See, e.g.*, Model Year 2010 USA Warranty and Maintenance Booklet at 3.

235.    That statement was materially false and misleading when made because Volkswagen knew that its authorized dealers would not honor the NVLW with respect to the Defect and would, instead, falsely blame the improper and accelerated tire wear suffered by CC owners on factors not covered by the warranty, such as bad tires or erratic driving.

236.    The warranty booklet also provides the following assurances to CC owners:

> With proper maintenance and care, your Volkswagen model will continue to provide you with a dependable and safe driving experience. This booklet contains Volkswagen's prescribed service intervals as well as other important information you need to know to care for your Volkswagen model properly. **Adherence to the prescribed maintenance services and intervals is necessary to protect your investment and help ensure optimum performance. . . .**
>
> The service intervals schedule is based on vehicles operating under normal conditions. (*See, e.g.*, Model Year 2010 USA Warranty and Maintenance Booklet at 26-27 (emphasis in original)).

237.    The foregoing statement was materially misleading and false when made because Volkswagen knew that, as a result of the Defect, CCs would ***not*** "continue to provide . . . a dependable and safe driving experience," even if the owner followed the prescribed maintenance procedures.

## PRIVITY

238.    The Plaintiffs and the other Class Members were in privity with Volkswagen because Volkswagen made direct representations to consumers, who were the ultimate purchasers, about the qualities and attributes of the Class Vehicles and their component parts. For example, without limitation, Volkswagen's NVLW, which is delivered to the consumers, states that "[w]ith proper maintenance and care, your Volkswagen model will continue to provide you with a dependable and safe driving experience."

239.    Moreover, in promoting, selling, and repairing its defective Class Vehicles, Volkswagen acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Volkswagen representatives and agents.

240.    Volkswagen, through its authorized dealerships, issued its warranties in the NVLW to the Plaintiffs and other Class Members as part of the sale of the Class Vehicles. Therefore, the NVLW is a contract between Volkswagen and the Class Members.

241.    Among other things, the warranties provided by Volkswagen for the defective Class Vehicles direct consumers to take their vehicles to these authorized dealerships for repairs or services.

242.    And, upon experiencing harm to their Vehicles' tires as a result of the Defect, consumers reciprocated Volkswagen's direct dealings by filing complaints in person and in writing with both the authorized dealerships and Volkswagen.

243.    Volkswagen acknowledges that its dealers act as Volkswagen agents in the NVLW and the Owner's Manual. For example, the NVLW notes that Volkswagen dealerships have "Volkswagen trained technicians, proper workshop equipment and parts to give you expert service."

244.    Similarly, the Volkswagen Owner's Manuals provide, in relevant part, as follows:

    a.  "If you experience increased tire wear under normal driving conditions, have the vehicle suspension checked by an authorized Volkswagen dealer or an authorized Volkswagen Service Facility."

    b.  "The tires must be checked immediately for hidden damage by an authorized Volkswagen dealer or an authorized Volkswagen Service Facility."

    c.  "Incorrect wheel alignment causes excessive and uneven tire wear, impairing vehicle safety. If you notice excessive or uneven tire wear, have the wheel alignment checked by an authorized Volkswagen dealer or an authorized Volkswagen Service Facility."

    d.  "Have repairs and vehicle modifications performed by an authorized Volkswagen dealer or an authorized Volkswagen Service Facility."

245.    Upon information and belief, as described below, Volkswagen exercises and maintains the right to exercise day-to-day control over the activities of its authorized dealers:

    a.  Volkswagen supervises its dealerships daily and can terminate the relationship at will;

    b.  Volkswagen dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

    c.  Volkswagen may direct an authorized dealer to hire or fire an employee;

    d.  Volkswagen directs its authorized dealers as to the manner in which they can respond to complaints and inquiries concerning defective vehicles;

    e.  Volkswagen requires its dealerships to follow its rules and policies in conducting all aspects of its business, including the delivery to consumers of the NVLW and all warranties and material information contained therein;

    f.   Volkswagen requires that its authorized dealers post a certain minimum number of Volkswagen signs on the dealers' property and then directs the dealers on the required size and location of those signs;

    g.   Volkswagen at all times has ready access to all of the dealers' sales and service records through an online database;

    h.   Volkswagen can enter the dealers' property at any time and demand to inspect or audit the dealers' books and financial records;

    i.   Volkswagen requires its authorized dealers to follow its rules and policies in servicing defective vehicles, such as the Plaintiffs' Class Vehicles. For example, but without limitation, the NVLW says that the Warranty "will be honored by any authorized Volkswagen dealer in the United States, including its territories."

246.    Volkswagen's NVLW not only extends the warranty to all consumers who buy a new vehicle from a Volkswagen dealership, but mandates that the warranty be "automatically transferred without cost if the ownership of the vehicle changes within the Warranty period." (*see, e.g.*, 2010 New Vehicle Limited Warranty, at 8). Therefore, the same warranty that applies to new purchasers is, by the terms of the warranty, transferrable to used purchasers as well.

247.    Any efforts to limit this warranty in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

248.    Any limitations on the warranty are also procedurally unconscionable. There was unequal bargaining power between Volkswagen, on the one hand, and the Plaintiffs and the Class Members, on the other.

249.     Finally, any limitations on the Warranties are substantively unconscionable. Volkswagen knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. Volkswagen failed to disclose the Defect to the Plaintiffs and the other Class Members. And, when the Plaintiffs and the other Class Members brought their cars in for service, Volkswagen—working together with its authorized dealers—actively concealed the existence of the Defect and prevented the Plaintiffs and the other Class Members from discovering it. Thus, Volkswagen's enforcement of the durational limitations on these warranties is harsh and shocks the conscience.

250.     In either event, contractual privity is not required here because the Plaintiffs and each of the other Class Members were (and are) intended third-party beneficiaries of the NVLW. After all, the dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles by Volkswagen.

251.     As evidenced below, Volkswagen's warranty agreements were designed for and intended to benefit only the consumers—that is, the Class Members:

    a.  For example, the NVLW reads, "[w]ith proper maintenance and care, your Volkswagen model will continue to provide you with a dependable and safe driving experience. This booklet contains Volkswagen's prescribed service intervals as well as other important information you need to know to care for your Volkswagen model properly. *Adherence to the prescribed maintenance services and intervals is necessary to protect your investment and help ensure optimum performance*. . . ." (emphasis original).

    b.  Similarly, the Owner's Manual for the Class Vehicles is tailored to the consumers, instructing, "[i]f you experience increased tire wear under normal driving

conditions, have the vehicle suspension checked by an authorized Volkswagen dealer or an authorized Volkswagen Service Facility."

252.    Privity is also not required here because the Class Vehicles are dangerous instrumentalities as a result of the Defect. Volkswagen acknowledges this inherent danger in its Owner's Manual:

  a.    "If you experience increased tire wear under normal driving conditions, have the vehicle suspension checked by an authorized Volkswagen dealer or an authorized Volkswagen Service Facility."

  b.    "Incorrect wheel alignment causes excessive an uneven tire wear, impairing vehicle safety. If you notice excessive or uneven tire wear, have the wheel alignment checked by an authorized Volkswagen dealer or an authorized Volkswagen Service Facility."

## TOLLING OF THE STATUTE OF LIMITATIONS

## Fraudulent Concealment

253.    Upon information and belief—and as described more fully above—Volkswagen has known about the Defect since at least 2010.  But, rather than remedy the Defect or disclose it to the public, Volkswagen has actively concealed the Defect—and its associated damages and costs—from the public, the Plaintiffs, and the Class Members. More than that, for years, Volkswagen downplayed the widespread prevalence of the problem and caused its dealers to lie to consumers about the cause of the improper and accelerated tire wear they suffered.  Any applicable statute of limitations has therefore been tolled by Volkswagen's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

## Discovery Rule

254.    The causes of action alleged herein did not accrue until the Plaintiffs and the Class Members discovered that their vehicles had the Defect.

255.    The Plaintiffs and the Class Members, however, had no realistic ability to discern that the Class Vehicles were defective until they learned of the existence of the Defect. In either event, the Plaintiffs and the Class Members had no reason to discover their causes of action because of Volkswagen's active concealment of the true nature of the Defect.

## Estoppel

256.    Volkswagen was, and remains, under a continuing duty to disclose to the Plaintiffs and to the Class Members the true character, quality, and nature of the Class Vehicles. This would include the existence of the Defect and the extent of the damages the Defect would cause.   Instead, Volkswagen actively concealed the true character, quality, and nature of the Class Vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the Class Vehicles. The Plaintiffs and the Class Members reasonably relied upon Volkswagen's knowing and affirmative misrepresentations and/or active concealment of these facts.   Based on the foregoing, Volkswagen is estopped from relying on any statute of limitations in defense of this Action.

## CLASS ACTION ALLEGATIONS

257.    The Classes' claims all derive directly from a single course of conduct by Volkswagen.   This case is about the responsibility of Volkswagen, at law and in equity, for its knowledge, its conduct, and its products.   Volkswagen has engaged in uniform and standardized conduct toward the Classes.   Volkswagen did not differentiate, in degree of care or candor, in its actions or inactions, or in the content of its statements or omissions, among individual Class

Members.  The objective facts on these subjects are the same for all Class Members.  Within each Claim for Relief asserted by the Classes, the same legal standards govern.  Additionally, many states—and for some claims all states—share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide classes.  Accordingly, the Plaintiffs bring this lawsuit as a class action on their own behalf, and on behalf of all other persons similarly situated as members of the proposed Classes, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

## The Nationwide Consumer Class

258.    The Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a), (b)(2), and/or (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and a Nationwide Consumer Class initially defined as follows:

**All current and former owners or lessees of Class Vehicles.**

## The State Consumer Classes

259.    The Plaintiffs allege statewide class action claims on behalf of classes in the following states: Arizona, California, Florida, Georgia, Louisiana, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Texas, Utah and Virginia (each a "Sub-Class State"). Each of these State Consumer Classes is initially defined as follows:

**All current and former owners or lessees of Class Vehicles who purchased or leased a Class Vehicle in a Sub-Class State.**

260.    The Nationwide Consumer Class, the Statewide Consumer Classes, and their members are sometimes referred to herein as the "Class" or the "Classes."

261.     Excluded from each Class are the Defendants, their employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

## Numerosity and Ascertainability

262.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). There are tens of thousands of Class Vehicles nationwide, and there are hundreds and often thousands of Class Vehicles in each of the Sub-Class States. Individual joinder of all Class members is therefore impracticable.

263.     Each of the Classes is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by Volkswagen or by third parties in the usual course of business. This information will therefore naturally be within the possession, custody, or control of Volkswagen, its authorized dealers, or third parties.  The Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

## Predominance of Common Issues

264.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers and which are the same for each of the respective Classes predominate over questions affecting only individual Class members. These include, without limitation, the following:

      a.   whether the Class Vehicles contain the Defect;

      b.   whether the Class Vehicles have suffered a diminution in value as a result of the Defect;

c.   whether the Defect constitutes an unreasonable safety risk;

d.   whether Volkswagen knew or should have known about the Defect, and, if so, how long ago Volkswagen discovered or should have discovered the Defect.

e.   whether Volkswagen had a duty to disclose the existence of the Defect to the Plaintiffs and the Class Members.

f.   whether Volkswagen failed to disclose the existence of the Defect to the Plaintiffs and the Class Members.

g.   whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Class Vehicle;

h.   whether Volkswagen's acts and omissions as alleged herein breached its warranty with the Plaintiffs and the Class Members.

i.   whether the Plaintiffs and the Class Members are entitled to monetary damages as a result of Volkswagen's wrongful conduct;

j.   whether Volkswagen's concealment of the true defective nature of the Class Vehicles induced the Plaintiffs and Class Members to act to their detriment by purchasing the Class Vehicles;

k.   whether Volkswagen's conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or application of equitable estoppel;

l.   whether Volkswagen misrepresented that the Class Vehicles were safe;

m.   whether Volkswagen engaged in unfair, deceptive, unlawful, and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Class Vehicles were designed, manufactured, and sold with the Defect;

n.   whether Volkswagen's conduct, as alleged herein, was likely to mislead a reasonable consumer;

o.   whether Volkswagen violated each of the Sub-Class States' consumer protection statutes, and if so, what remedies are available under those statutes;

p.   whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

q. whether the Plaintiffs and the Class Members are entitled to a declaratory judgment stating that the Class Vehicles are defective and/or not merchantable;

r. whether Volkswagen's unlawful, unfair, and/or deceptive practices harmed the Plaintiffs and the Class Members;

s. whether the Plaintiffs and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

t. whether Volkswagen should be declared responsible for notifying all Class Members of the Defect and ensuring that all vehicles with the Defect are promptly recalled and repaired;

u. what aggregate amounts of statutory penalties are sufficient to punish and deter Volkswagen and to vindicate statutory and public policy objectives; and

v. how such penalties should be most equitably distributed among the Class Members.

### Typicality

265.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3), because the Plaintiffs' claims are typical of the claims of the Class Members and arise from the same course of conduct by Volkswagen. The relief the Plaintiffs seek is typical of the relief sought for the other Class Members.

### Adequate Representation

266.    The Plaintiffs will fairly and adequately represent and protect the interests of the Classes. The Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

267.    The Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither the Plaintiffs nor their counsel has interests adverse to those of the Classes.

**Superiority**

268.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Volkswagen has acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

269.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3), because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

270.     The common questions of law and of fact regarding Volkswagen's conduct and responsibility predominate over any questions affecting only individual Class Members.

271.     Because the damages suffered by each individual Class Member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class Members to redress the wrongs done to each of them individually, such that most or all Class Members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

272.     The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class Member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of

class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

273.    The Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of the Plaintiffs or on its own determination, certify nationwide, statewide, and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

274.    The Classes expressly disclaim any recovery in this action for physical injury resulting from the Defect without waiving or dismissing such claims. The Plaintiffs are informed and believe that injuries suffered in crashes as a result of the Defect implicate the Class Vehicles, constitute evidence supporting various claims, including diminution of value, and are continuing to occur because of Volkswagen's delays, omissions, fraudulent concealment, and inaction. The increased risk of injury from the Defect serves as an independent justification for the relief sought by the Plaintiffs and the Classes.

**REALLEGATION AND INCORPORATION BY REFERENCE**

275.    The Plaintiffs re-allege and incorporate by reference all of the preceding paragraphs and allegations of this Complaint, including the Nature of Claims, Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Nationwide Class and the Statewide Classes.

## CLAIMS FOR RELIEF

### I.    Nationwide Claims

#### A.    Federal Claims

## COUNT 1

**Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.***

276.    The Plaintiffs bring this Count against Volkswagen on behalf of members of the Nationwide Consumer Class, as well as on behalf of members of the State Consumer Sub-Classes who purchased or leased the Class Vehicles in the following States: Arizona, California, Florida, Georgia, Louisiana, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Texas, Utah, and Virginia.

277.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

278.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

279.    The Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

280.    Volkswagen is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

281.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

282.     Volkswagen provided the Plaintiffs and the other Class Members with an express warranty in connection with the purchase or lease of their vehicles that constitutes a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).

283.     Volkswagen made promises and representations in the express warranty it provided to all consumers, which became the basis of the bargain between the Class Members and Volkswagen.

284.     Specifically, the express warranty provided, in pertinent part:

> Your New Vehicle Limited Warranty includes virtually bumper to bumper coverage for 3 years or 36,000 miles, whichever occurs first and powertrain limited warranty coverage for 5 years or 60,000 miles, whichever occurs first. Your vehicle has a limited warranty corrosion against perforation for a period of 12 years irrespective of mileage.

285.     Additionally, Volkswagen provided the Plaintiffs and the other Class Members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that constitutes an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

286.     As a part of the implied warranty of merchantability, Volkswagen warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

287.     Volkswagen breached both the express and implied warranties ("Warranties"), as described in more detail above, and is therefore liable to the Plaintiffs and the Class Members pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect.

288. Any efforts to limit the Warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

289. Any limitations on the Warranties are also procedurally unconscionable. There was unequal bargaining power between Volkswagen, on the one hand, and the Plaintiffs and the Class Members, on the other.

290. Finally, any limitations on the Warranties are also substantively unconscionable. Volkswagen knew that the Class Vehicles were defective and would continue to pose safety risks after the Warranties purportedly expired. Volkswagen failed to disclose the Defect to the Plaintiffs and the other Class Members. And, when the Plaintiffs and the other Class Members brought their cars in for service, Volkswagen—working together with its authorized dealers—actively concealed the existence of the Defect and prevented the Plaintiffs and the other Class Members from discovering it. Thus, Volkswagen's enforcement of the durational limitations on these Warranties is harsh and shocks the conscience.

291. Privity is not required here because the Plaintiffs and each of the other Class Members are intended beneficiaries of contracts—specifically, of the NVLW—between Volkswagen and its dealers. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is not required because the Class Vehicles are dangerous instrumentalities as a result of the Defect.

292. Pursuant to 15 U.S.C. § 2310(e), the Plaintiffs are entitled to bring this class action and are not required to give Volkswagen notice and an opportunity to cure until such time

as the Court determines the representative capacity of the Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

293.     Furthermore, affording Volkswagen an opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, Volkswagen knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation or disclose the defective design.

294.     In addition, in the years since 2010, Volkswagen has received thousands of complaints about the Defect and has done nothing to remedy it. Instead, Volkswagen and its authorized dealers have worked together to blame others—including the Class Members themselves—for the problems the Defect has been causing. There is therefore no reason to believe that any further notice to Volkswagen would cause Volkswagen to take any action to rectify the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that the Plaintiffs resort to an informal dispute resolution procedure or afford Volkswagen a reasonable opportunity to cure its breach of warranties should be excused and deemed satisfied.

295.     The Plaintiffs and the other Class Members would suffer economic hardship if they simply returned their Class Vehicles but did not receive the return of all payments made by them. Because Volkswagen is refusing to acknowledge any revocation or acceptance and return immediately any payments made, the Plaintiffs and the other Class Members have not re-accepted their Defective Vehicles by retaining them.

296.     The amount in controversy of the Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive

of interest and costs, computed on the basis of all claims to be determined in this lawsuit. The Plaintiffs, individually and on behalf of the other Class Members, seek all damages permitted by law, including but not limited to diminution in value of their vehicles and benefit-of-the-bargain damages, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), the Plaintiffs and the other Class Members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by the Plaintiffs and the other Class Members in connection with the commencement and prosecution of this action.

297.    The Plaintiffs also request, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Defect in their vehicles. Such expenses and losses will continue as the Plaintiffs and Class Members must take time off from work, pay for rental cars or other transportation arrangements, and child care.

298.    The rights of Class members to recover these expenses—that is, to put them where they would have been but for Volkswagen's conduct—presents a common question of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by Volkswagen, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

### B.  Common Law and State Law Claims

### COUNT 2

### Fraud

299.    The Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under the common law of fraudulent concealment and fraudulent inducement ("Fraud"), as there are no true conflicts (case-dispositive differences) among the various states' common laws of Fraud.  In the alternative, the Plaintiffs bring this claim under the laws of the states where the Plaintiffs and

Class Members reside and where they purchased or leased their Class Vehicles—that is, the Sub-Class States.

300.     Since at least 2010, Volkswagen knew or should have known that the Class Vehicles are defective, that they suffer from the Defect, and that they are not fit for their intended purpose of providing consumers with safe and reliable transportation.

301.     Volkswagen concealed, suppressed, and/or misrepresented material facts regarding the Defect, which causes, among other effects, the vehicles' tires to erode and ultimately malfunction.

302.     Volkswagen took steps to ensure that its employees and authorized dealerships did not reveal the known Defect to regulators or consumers.

303.     In turn, Volkswagen represented and had its employees and authorized dealerships represent that its vehicles were safe, reliable, of high quality, and that they would perform in a manner commensurate with their intended use.

304.     Upon information and belief, Volkswagen still has not made full and adequate disclosure, continues to defraud the Class Members, and continues to conceal, suppress, and misrepresent material information regarding the Defect that exists because of, among other things, improperly designed and installed suspension components in the Class Vehicles.

305.     Volkswagen had a duty to disclose the Defect because it:

    a.  Had exclusive and/or far superior knowledge and access to the facts than the Plaintiffs and the Class Members, and knew the facts were not known to or reasonably discoverable by the Plaintiffs and the Class;

    b.  Intentionally concealed the foregoing from the Plaintiffs; and

      c.   Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

306.    These concealed, suppressed, and/or misrepresented facts were material because they would be relied on by a reasonable person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by the Plaintiffs and the other Class Members.  Whether a merchant's products are safe and reliable, and whether that merchant stands behind its products, are material concerns to a consumer.  The Plaintiffs and the Class Members trusted Volkswagen not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

307.    Volkswagen concealed suppressed, and/or misrepresented these material facts to falsely assure purchasers, lessees, and consumers that its vehicles were capable of performing safely, as represented by Volkswagen and reasonably expected by consumers.

308.    Volkswagen actively concealed, suppressed, and/or misrepresented these material facts, in whole or in part, to protect its profits and to avoid recalls that would hurt the brand's image and cost Volkswagen money.  Volkswagen concealed these facts at the expense of the Plaintiffs and the other Class Members.

309.    The Plaintiffs and the other Class Members were unaware of these omitted, concealed, and/or misrepresented material facts, and would not have acted as they did if they had known of these facts.

310.    Had the Plaintiffs and the other Class Members been aware of the Defect, and of Volkswagen's callous disregard for their safety, the Plaintiffs and the other Class Members either

would have paid less for their Class Vehicles or would not have purchased or leased the Class Vehicles at all.

311.    The Plaintiffs and the other Class Members did not receive the benefit of their bargain as a result of Volkswagen's fraudulent concealment and fraudulent inducement.

312.    Because of the concealment, suppression, and/or misrepresentation of the facts, the Plaintiffs and the other Class Members sustained damage because they own vehicles that diminished in value as a result of Volkswagen's concealment of, and failure to timely disclose, the serious Defect in thousands of Class Vehicles and the serious safety and quality issues caused by Volkswagen's conduct.

313.    The value of the Plaintiffs' and all the other Class Members' vehicles has diminished as a result of Volkswagen fraudulently concealing the Defect and fraudulently inducing the Plaintiffs and the other Class Members to purchase the Class Vehicles with the Defect.   \Now that the Defect is widely known, any reasonable consumer will be reluctant to purchase or lease any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the Class vehicles.

314.    The Plaintiffs and the other Class Members also have incurred (and will continue to incur) substantial out-of-pocket costs relating to the maintenance, repair, and replacement of the prematurely worn and degraded tires, and have suffered benefit-of-the-bargain damages, as the value of the Class Vehicles as delivered was less than the value of the Class Vehicles as promised.

315.    Accordingly, Volkswagen is liable to the Plaintiffs and the Class Members for their damages in an amount to be proven at trial.

316.    Volkswagen's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the Plaintiffs' and the Class Member's rights and well-being, and with the aim of enriching Volkswagen. Volkswagen's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 3

### Breach of Implied Warranty

317.    The Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under the common law breach of implied warranty, as there are no true conflicts (case-dispositive differences) among various states' laws for a breach of implied warranty. In the alternative, the Plaintiffs bring this claim under the laws of the states where the Plaintiffs and the Class Members reside and/or purchased or leased their Class Vehicles—that is, the Sub-Class States.

318.    Volkswagen is a merchant with respect to motor vehicles.

319.    Under the common law claim of breach of implied warranty, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when the Plaintiffs and the other Class Members purchased or leased their Class Vehicles.

320.    The Class Vehicles, when manufactured, sold, and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used, because they are constructed with the Defect, leading to an unreasonable likelihood of damage to the Class Vehicles and serious bodily injury to the vehicle occupants, proximate motorists, and anyone in the vicinity of the defective Class Vehicles.

321.    Volkswagen was provided notice of the Defect through its knowledge of the issues, by customer complaints, and by numerous individual letters and communications sent by the consumers.  Moreover, Volkswagen was aware of these problems long before the Plaintiffs and the Class Members and had ample notice and opportunity to correct them.

322.    Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

323.    Any limitations on the implied warranties are also procedurally unconscionable. There was unequal bargaining power between Volkswagen, on the one hand, and the Plaintiffs and the other Class Members, on the other.

324.    Any limitations on the implied warranties are also substantively unconscionable. Volkswagen knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. Volkswagen failed to disclose the Defect to the Plaintiffs and the other Class Members. And, when the Plaintiffs and the other Class Members brought their cars in for service, Volkswagen—working together with its authorized dealers—actively concealed the existence of the Defect and prevented the Plaintiffs and the other Class Members from discovering it. Thus, Volkswagen's enforcement of the durational limitations on these warranties is harsh and shocks the conscience.

325.    Privity is not required here because the Plaintiffs and each of the other Class Members are intended beneficiaries of contracts—and, specifically, of the NVLW—between Volkswagen and its dealers. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit only the consumers.

326.     Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned Defect.

327.     As a direct and proximate result of Volkswagen's breach of the implied warranty of merchantability, the Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT 4

### Breach of Express Warranty

328.     This claim is brought only on behalf of those Plaintiffs and other Class Members who returned their Class Vehicles for service at an authorized Volkswagen dealership within the warranty period

329.     This claim arises under the common law breach of express warranty, as there are no true conflicts or case-dispositive differences between the laws of the several states across the country for a claim of breach of express warranty.

330.     In the alternative, the Plaintiffs bring this claim under the laws of the states where the Plaintiffs and the other Class Members reside and/or purchased, leased, or sought repairs for their Class Vehicles—that is, the Sub-Class States.

331.     Volkswagen is a merchant with respect to motor vehicles.

332.     Volkswagen provided all purchasers and lessees of the Class Vehicles with the express warranty described herein, which became part of the basis of the bargain the Class Members struck with Volkswagen.

333.     Volkswagen designed, manufactured, installed, marketed, sold, and/or distributed the Class Vehicles with defects covered by the express warranty.

334.     In its NVLW, Volkswagen guarantees the following:

a. "Your New Vehicle Limited Warranty includes virtually bumper to bumper coverage for 3 years or 36,000 miles, whichever occurs first . . . ."

b. "This limited warranty covers any repair to correct a manufacturer's defect in material or workmanship . . . ."

c. "This limited warranty will be honored by any authorized Volkswagen dealer in the United States, including its territories."

d. There are approximately 600 authorized Volkswagen dealers in the United States. Each of these dealers has Volkswagen-trained technicians, Volkswagen-approved workshop equipment, and Volkswagen-approved service and repair policies and procedures.

335. Volkswagen breached the express warranty by refusing to repair, adjust, and/or replace the CC parts affected by the Defect free of charge. Instead of repairing, adjusting, or replacing these parts for free, as the express warranty requires, Volkswagen and its authorized dealers compelled the Plaintiffs and the other Class Members to pay for new replacement tires and re-alignments that do not remedy the problems caused by the Defect.

336. The Plaintiffs, Lila Wilson, Matthew Martino, Thomas Wilson, Teresa Garella, Ryan Brown, Nick Panopoulos, Brian Maytum, Carissa Macchione, Sydnee Johnson, Jorge Cruz, Ismael Orrantia, and Debbie Gray, or the prior owners of their Class Vehicles, notified Volkswagen and/or its authorized dealers of the breach within a reasonable time after discovering an issue with their vehicles. That is, these Plaintiffs and thousands of other Class Members brought their CC vehicles in for service and/or repair of the Defect.

337. Since as early as 2010, Volkswagen knew of the Defect through comments and postings, not only on NHTSA webpages, but also on webpages belonging to, or actively

monitored by, Volkswagen. Volkswagen also knew of the Defect because it has access to its dealerships' maintenance and service records database and thus would have been privy to the many instances in which consumers across the country brought their Class Vehicles in for service or repair, complaining of premature tire wear and cupping.

338.    Even had the Plaintiffs not notified Volkswagen of the Defect, that failure would be of little relevance here because such notice would have been futile. After all, Volkswagen has refused to remedy the Defect in any of the Class Vehicles. Instead, working with its dealers, Volkswagen has made every effort to blame the Defect's manifestations either on the consumers themselves or else on third parties.

339.    As a direct and proximate cause of Volkswagen's breach of its express warranties, the Plaintiffs and the other Class Members have suffered, and will continue to suffer, damages in an amount to be determined at trial.

340.    The Plaintiffs and the other Class Members are entitled to legal and equitable relief against Volkswagen, including damages, consequential damages, specific performance, rescission, costs, attorneys' fees, and other relief as appropriate.

**II.    State Sub-Class Claims**

**A.    Claims Brought on Behalf of the Arizona Sub-Class**

**COUNT 5**

**Violation of the Consumer Fraud Act
Ariz. Rev. Stat. §§ 44-1521, *et seq.***

341.    This claim is brought only on behalf of Lorne Spelrem and the entire Arizona Consumer Sub-Class against Volkswagen.

342.    The Plaintiff Lorne Spelrem, the Arizona Sub-Class, and Volkswagen are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

343.    Volkswagen engaged in "sales" of "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5) & (7).

344.    The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

345.    In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

346.    In light of the Defect that persists in all of the Class Vehicles—a Defect Volkswagen never disclosed—Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

347.    Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 2010, by way of numerous public and private complaints about the Defect and subsequent malfunctions.

348.    By failing to disclose and by actively concealing the Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that values safety, Volkswagen engaged in unfair or deceptive business practices in violation of the Arizona CFA.  To ensure that consumers would purchase and/or lease the Class Vehicles, Volkswagen deliberately withheld the information about the propensity of the Defect to cause premature tire wear, irregular driving performance, and a variety of other complications, instead of addressing the Defect to ensure the comfort and safety of the consumers and vehicle occupants.

349.    In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the dangerous risks, costs, and devaluations posed by the Defect. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were reliable and of high quality, and by claiming to be reputable manufacturers that value safety.

350.    Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including the Plaintiffs, about the true safety, the true value, the and reliability of the Class Vehicles.

351.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intention to mislead the Plaintiffs and the Arizona Sub-Class.

352.    Volkswagen knew or should have known that its conduct violated the Arizona CFA.

353.    As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles that were either false or misleading.   Volkswagen's

representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable despite knowing of the Defect and despite failing adequately to investigate it.

354.    To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers, costs, and risks posed by the Class Vehicles, allowed unsuspecting new and used car purchasers and lessees to continue to buy/lease the Class Vehicles, and allowed the Arizona Sub-Class to continue driving highly dangerous vehicles.

355.    Volkswagen owed the Arizona Sub-Class a duty to disclose the true safety, the true costs, and the true reliability of the Class Vehicles because Volkswagen:

a.  Possessed exclusive knowledge of the dangers, costs, and risks posed by the Defect;

b.  Intentionally concealed the Defect from the Arizona Sub-Class; and/or

c.  Made incomplete representations about the safety, cost, and reliability of the Class Vehicles generally, while purposefully withholding material facts from the Arizona Sub-Class that contradicted Volkswagen's representations.

356.    Because of the Defect in the Class Vehicles—and Volkswagen's refusal to remedy the serious and dangerous manifestations of the Defect—the value of the Class Vehicles has been greatly diminished.

357.    Volkswagen's failure to disclose—and active concealment of—the true dangers, costs, and risks posed by the Defect were material to the Arizona Sub-Class' decision to purchase the Class Vehicles. That is, had the members of the Arizona Sub-Class known that the Class Vehicles contained the Defect, they either would not have purchased the CC or else would have paid significantly less for it.

358.     The Arizona Sub-Class has suffered ascertainable losses as a result of Volkswagen's misrepresentations omissions. After all, because of the presence of the Defect and Volkswagen's subsequent misconduct in concealing it, the Plaintiffs did not receive the benefit of their bargain with Volkswagen.

359.     Volkswagen's violations present a continuing risk to the Plaintiffs, the Arizona Sub-Class, as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

360.     As a direct and proximate result of Volkswagen's violations of the Arizona CFA, the Plaintiff Lorne Spelrem and the entire Arizona Sub-Class have suffered injury-in-fact and actual damages.

361.     Volkswagen is liable to Lorne Spelrem and the entire Arizona Sub-Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Volkswagen's unfair and deceptive practices, and any other just and proper relief under Ariz. Rev. Stat. § 44-1528.

### B.  Claims Brought on Behalf of the California Sub-Class

### COUNT 6

**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200,** ***et seq.***

362.     This claim is brought only on behalf of Brian Maytum and the entire California Consumer Sub-Class against Volkswagen.

363.     Cal. Bus. & Prof. Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising . . . ." Volkswagen engaged in conduct that violated each of this statute's three prongs.

364.    Volkswagen committed an unlawful business act or practice in violation of §
17200 by its violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, as
set forth above, by the acts and practices set forth in this Amended Complaint.

365.    Volkswagen also violated the unlawful prong because it has engaged in violations
of the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations by failing to
promptly notify vehicle owners, purchasers, lessees, dealers, and NHTSA of the defective Class
Vehicles, and by failing to remedy the Defect.

366.    Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor vehicle
manufacturer's responsibility to notify the NHTSA of a motor vehicle defect within five days of
determining that a defect in a vehicle has been determined to be safety-related. *See* 49 C.F.R. §
573.6.

367.    Volkswagen violated the reporting requirements of FMVSS 573 requirement by
failing to report the Defect or any of the other dangers or risks posed by the Defect within five
days of determining the defect existed, and failing to recall all the Class Vehicles.

368.    Volkswagen violated the common-law claim of negligent failure to recall, in that
Volkswagen knew or should have known that the Class Vehicles were dangerous and/or were
likely to be dangerous when used in a reasonably foreseeable manner; Volkswagen became
aware of the attendant risks after they were sold; Volkswagen continued to gain information
further corroborating the Defect and dangers posed by it; and Volkswagen failed to recall the
Vehicles, which failure was a substantial factor in causing harm to the Plaintiffs and the
California Sub-Class, including diminished value and out-of-pocket costs.

369.    Volkswagen committed unfair business acts and practices in violation of § 17200
when it concealed the existence and nature of the Defect, dangers, and risks posed by the Class

Vehicles.  Volkswagen represented that the Class Vehicles were reliable and safe when, in fact, they are not.

370.    Volkswagen also violated the unfairness prong of § 17200 by failing to administer a recall of the Class Vehicles.

371.    Volkswagen violated the fraudulent prong of § 17200 because the misrepresentations and omissions regarding the safety and reliability of the Class Vehicles, as set forth in this Amended Complaint were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

372.    Volkswagen committed fraudulent business acts and practices in violation of § 17200 when it concealed the existence and nature of the Defect, dangers, and risks posed by the Class Vehicles, while representing in its marketing, advertising, and other broadly disseminated representations that the Class Vehicles were reliable and safe when, in fact, they are not. Volkswagen's active concealment of the dangers and risks posed by the Class Vehicles and/or the Defect are likely to mislead the public with regard to their true defective nature.

373.    Volkswagen has violated the unfair prong of § 17200 because of the acts and practices set forth in this Amended Complaint, including the manufacture and sale of the Class Vehicles, and Volkswagen's failure to adequately investigate, disclose and remedy, offend established public policy, and because of the harm they cause to consumers greatly outweighs any benefits associated with those practices. Volkswagen's conduct has also impaired competition within the automotive vehicles market and has prevented the Plaintiffs and the California Sub-Class from making fully informed decisions about whether to purchase or lease the defective Class Vehicles and/or the price to be paid to purchase or lease them.

374.    The Plaintiffs and the California Sub-Class have suffered injuries in fact, including the loss of money or property, as a result of Volkswagen's unfair, unlawful, and/or deceptive practices.  As set forth above, each member of the California Sub-Class, in purchasing or leasing the Class Vehicles with the Defect, relied on the misrepresentations and/or omissions of Volkswagen with respect of the safety and reliability of the vehicles.  Had the Plaintiffs and the members of the California Sub-Class known the truth, they would not have purchased or leased their vehicles and/or paid as much for them.

375.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Volkswagen's businesses. Volkswagen's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated.

376.    As a direct and proximate result of Volkswagen's unfair and deceptive practices, the Plaintiffs and the California Sub-Class have suffered and will continue to suffer actual damages.

377.    The Plaintiffs and the California Sub-Class request that this Court enter such orders or judgments as may be necessary to enjoin Volkswagen from continuing their unfair, unlawful, and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203; and for such other relief set forth below.

## COUNT 7

### Violation of the California False Advertising Law
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

378.    This claim is brought only on behalf of Brian Maytum and the entire California Consumer Sub-Class against Volkswagen.

379.    California Bus. & Prof. Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to

induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

380.    Volkswagen caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Volkswagen, to be untrue and misleading to consumers, including the Plaintiffs and the entire California Sub-Class.

381.    Volkswagen has violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of the Class Vehicles, as set forth in this Complaint, were material and likely to deceive a reasonable consumer.

382.    Plaintiff Brian Maytum and the entire California Sub-Class have suffered an injury in fact, including the loss of money or property, as a result of Volkswagen's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, the Plaintiffs and the California Sub-Class relied on the misrepresentations and/or omissions of Volkswagen with respect to the safety and reliability of the Class Vehicles.  Volkswagen's representations turned out not to be true because the Class Vehicles are inherently defective and dangerous in that the Defect causes premature tire wear, irregular driving performance, and a variety of other complications, instead of assisting with steering and operational stability. Had the Plaintiffs and the California Sub-Class known the truth, they would not have purchased or leased their Class

Vehicles and/or paid as much for them. Accordingly, the Plaintiffs and the entire California Sub-Class overpaid for their Class Vehicles and did not receive the benefit of their bargain.

383.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Volkswagen's business. Volkswagen's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

384.    The Plaintiffs, individually and on behalf of the other California Sub-Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Volkswagen from continuing its unfair, unlawful, and/or deceptive practices and to restore to the Plaintiffs and the entire California Sub-Class any money Volkswagen acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**COUNT 8**

**Violation of the Song-Beverly Consumer Warranty Act for**
**Breach of the Implied Warranty of Merchantability**
**Cal. Civ. Code §§ 1791.1 & 1792**

385.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought on behalf of Brian Maytum and the entire California Consumer Sub-Class against Volkswagen.

386.    Plaintiff Brian Maytum and the members of the California Sub-Class are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

387.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

388. Volkswagen is considered a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

389. Volkswagen impliedly warranted to the Plaintiffs and the California Sub-Class that the Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792, however, they do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

390. Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

    a. Pass without objection in the trade under the contract description.

    b. Are fit for the ordinary purposes for which such goods are used.

    c. Are adequately contained, packaged, and labeled.

    d. Conform to the promises or affirmations of fact made on the container or label.

391. The Class Vehicles would not pass without objection in the automotive trade because the Defect, among other things, (a) causes uneven and accelerated tire wear; (b) causes vehicles to uncontrollably pull to one side; (c) causes discomfort for vehicle occupants; (d) minimizes friction between tires and the road, jeopardizing steering stability and vehicle performance; (e) allows sudden oscillations in the vehicle when traveling on uneven surfaces; and (f) does not allow for necessary correction and adjustment of the Vehicles' front cambers.

392. Because of the Defect, the Class Vehicles are not safe to drive and thus not fit for ordinary purposes of providing reliable, durable, and safe transportation.

393.    The Class Vehicles are not adequately labeled because the labeling fails to disclose the Defect. Volkswagen failed to warn about the dangerous Defect in the Class Vehicles.

394.    Volkswagen breached the implied warranty of merchantability by manufacturing and selling the Class Vehicles, which, among other things, (a) cause uneven and accelerated tire wear; (b) cause vehicles to uncontrollably pull to one side; (c) cause discomfort for vehicle occupants; (d) minimize friction between tires and the road, jeopardizing steering stability and vehicle performance; (e) allow sudden oscillations in the vehicle when traveling on uneven surfaces; and (f) do not allow for necessary correction or adjustment of the Vehicles' front cambers.

395.    These Defects have deprived the Plaintiffs and the California Sub-Class of the benefit of their bargain, and has caused the Class Vehicles to depreciate in value.

396.    Volkswagen was on notice of the Defect, by its knowledge of the issues, by customer complaints, and by numerous individual letters, and communications sent by the consumers.

397.    As a direct and proximate result of Volkswagen's breach of its duties under California's Lemon Law, the Plaintiffs and the California Sub-Class received goods whose dangerous condition substantially impairs their value. The Plaintiffs and the California Sub-Class have been damaged by the diminished value, malfunctioning, and non-use of their Class Vehicles.

398.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, the Plaintiffs and the California Sub-Class are entitled to damages and other legal and equitable relief including, at their election, the

purchase/lease price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

399.    Pursuant to Cal. Civ. Code § 1794, the Plaintiffs and the California Sub-Class are entitled to costs and attorneys' fees.

### C.  Claims Brought on Behalf of the Florida Sub-Class

### COUNT 9

**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201,** *et seq.*

400.    This claim is brought only on behalf of Lila Wilson and the entire Florida Consumer Sub-Class against Volkswagen.

401.    Plaintiff Lila Wilson and Florida Sub-Class are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.203(7).

402.    Volkswagen is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

403.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1). Volkswagen participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

404.    In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

405.    Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations or concealment, suppression or omission of

any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

406.    Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 2010, by way of numerous public and private complaints about the Defect and subsequent malfunctions.

407.    By failing to disclose and by actively concealing the Defect in the Class Vehicles, yet marketing them as safe, reliable, and of high quality, and by presenting itself as reputable seller that values safety, Volkswagen engaged in unfair or deceptive business practices in violation of the FDUTPA.   To ensure that consumers would purchase and lease the Class Vehicles, Volkswagen deliberately withheld information about the propensity of the Defect to cause premature tire wear, irregular and dangerous driving performance, and a variety of other complications, instead of addressing the Defect to ensure the comfort and protection of the consumers and vehicle occupants.

408.    In the course of Volkswagen's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Defect discussed above.   Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

409.    Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including the Plaintiffs, about the true safety and reliability of the Class Vehicles, the quality of Volkswagen's brand, and the true value of the Class Vehicles.

410. Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the entire Florida Sub-Class.

411. Volkswagen knew or should have known that its conduct violated the FDUTPA.

412. As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles that were either false or misleading. Volkswagen's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable despite its knowledge of the Defect or its failure to adequately investigate it.

413. To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers and risks posed by the Class Vehicles and their costly consequences, and allowed unsuspecting new and used car purchasers and lessees to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

414. Volkswagen owed the Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles because Volkswagen:

    a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b. Intentionally concealed the foregoing from the Plaintiffs; and/or

    c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

415. Because Volkswagen fraudulently concealed the Defect in the Class Vehicles, resulting in a cascade of negative publicity once the Defect finally began to be disclosed, the

value of the Class Vehicles has greatly diminished.  In light of the stigma attached to the Class Vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

416.    Volkswagen's failure to disclose and active concealment of the dangers and risks posed by the Defect in the Class Vehicles were material to the Plaintiffs and the Florida Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

417.    Plaintiff Lila Wilson and the Florida Sub-Class suffered ascertainable loss caused by Volkswagen's misrepresentations and its failure to disclose material information.  Had the Class Members been aware of the Defect that existed in the Class Vehicles and Volkswagen's complete disregard for safety, the Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  The Plaintiffs and the other Class Members did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

418.    Plaintiff Lila Wilson and the Florida Sub-Class risk irreparable injury as a result of Volkswagen's acts and omissions in violation of the FDUTPA, and these violations present a continuing risk to the Plaintiffs, the Florida Sub-Class, as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

419.    As a direct and proximate result of Volkswagen's violations of the FDUTPA, the Plaintiff, Lila Wilson, and the entire Florida Sub-Class have suffered injury-in-fact and/or actual damage.

420.     Plaintiff Lila Wilson and the entire Florida Sub-Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2), costs, and attorneys' fees under Fla. Stat. § 501.2105(1).

421.     Plaintiff Lila Wilson and the entire Florida Sub-Class also seek an order enjoining Volkswagen's unfair, unlawful, and/or deceptive practices, declaratory relief, costs, attorneys' fees, and any other just and proper relief available under the FDUTPA.

### COUNT 10

**Breach of Implied Warranty of Merchantability**
**Fla. Stat. § 672.314,** *et seq.*

422.     In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought on only behalf of Lila Wilson and the Florida Consumer Sub-Class against Volkswagen.

423.     Volkswagen is and was at all relevant times a merchant with respect to motor vehicles within the meaning of Fla. Stat. § 672.104(1).

424.     A warranty that the Class Vehicles were in merchantable condition was implied by law in the Class Vehicle transactions, pursuant to Fla. Stat. § 672.314.

425.     Volkswagen impliedly warranted that the Class Vehicles, which Volkswagen designed, manufactured, sold, and/or leased, were merchantable, fit for the ordinary purposes for which they were intended to be used, and were not otherwise injurious to consumers and their vehicles. The ordinary purpose for which the Class Vehicles are used is, among other things, to drive and operate in a manner that does not unnecessarily and unreasonably damage the vehicle and expose its owners, occupants, and nearby motorists to needless damage, harm, and risk.

426.     Volkswagen breached the implied warranty when it designed, manufactured, distributed, sold and leased the Class Vehicles.  The Class Vehicles, when sold or leased and at

all times thereafter, were not merchantable or fit for the ordinary purpose of providing reliable, durable, and safe transportation.  Specifically, they are defective and dangerous in that the Defect: (a) causes tires to prematurely wear; (b) causes uneven wear on tires; (c) causes vehicles to uncontrollably pull to one side; (d) causes discomfort for vehicle occupants; (e) minimizes friction between tires and the road, jeopardizing steering stability and vehicle performance; (f) allows sudden oscillations in the vehicle when traveling on uneven surfaces; and (g) does not allow for necessary correction and adjustment of the Vehicles' front cambers.

427.    Plaintiff Lila Wilson and the Florida Consumer Sub-Class, at all relevant times, were intended beneficiaries of Volkswagen's sale of Vehicles containing the Defect.

428.    Plaintiff Lila Wilson and members of the class have had sufficient direct dealings with either Volkswagen or its agent dealerships to establish privity of contract between Volkswagen, on the one hand, and Ms. Wilson and each of the members of the Florida Sub-Class, on the other hand. Volkswagen made direct representations about the quality and performance ability of the Class Vehicles targeted at the Ms. Wilson and the other Florida Consumer Sub-Class members directly and through its agent dealerships.

429.    Notwithstanding, privity is not required because Ms. Wilson and each of the members of the class are the intended beneficiaries of Volkswagen's implied warranties. Volkswagen's agent dealerships were not intended to be the ultimate consumers of the Defective Class Vehicles, as they maintain no rights under the warranty agreements that accompany the Class Vehicles. Instead, Volkswagen's implied warranty of merchantability was designed for and intended only to benefit the ultimate consumers, which are comprises of the Ms. Wilson and the members of the Florida Sub-Class.

430.    Volkswagen was provided notice of these issues by its knowledge of the issues and the many prior complaints filed against it.

431.    As a direct and proximate result of Volkswagen's breach of the warranties of merchantability and fitness for a particular purpose, Plaintiff Lila Wilson and the other members of the Florida Sub-Class have been damaged in an amount to be proven at trial.

### D.  Claims Brought on Behalf of the Georgia Sub-Class

### COUNT 11

**Violation of the Georgia Uniform Deceptive Trade Practices Act**
**Ga. Code Ann. §§ 10-1-370, *et seq.***

432.    This claim is brought only on behalf of Plaintiff Leigh Glasband and the entire Georgia Consumer Sub-Class against Volkswagen.

433.    Plaintiff Leigh Glasband, the Georgia Sub-Class, and Volkswagen are "persons" within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code Ann. § 10-1-371(5).

434.    The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a). By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles, Volkswagen engaged in deceptive trade practices prohibited by the Georgia UDTPA.

435.    In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

436.    Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

437.    Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 2010 by way of numerous public and private complaints about the Defect and subsequent malfunctions.

438.    By failing to disclose and by actively concealing the Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting itself as reputable manufacturers that value safety, Volkswagen engaged in unfair or deceptive business practices in violation of the Georgia UDTPA.  To ensure that consumers would purchase and/or lease the Class Vehicles, Volkswagen deliberately withheld the information about the propensity of the Defect to cause premature tire wear, irregular driving performance, and a variety of other complications, instead of addressing the Defect to ensure the comfort and protection of the consumers and vehicle occupants.

439.    In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Defect discussed above.  Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

440.    Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable

consumers, including the Plaintiffs, about the true safety and reliability of the Class Vehicles, the quality of Volkswagen's brands, and the true value of the Class Vehicles.

441.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intention to mislead the Plaintiffs and the Georgia Sub-Class.

442.    Volkswagen knew or should have known that its conduct violated the Georgia UDTPA.

443.    As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles that were either false or misleading. Volkswagen's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable despite its knowledge of the Defect or its failure to adequately investigate it.

444.    To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers and risks posed by the Class Vehicles and their costly consequences, and allowed unsuspecting new and used car purchasers and lessees to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

445.    Volkswagen owed the Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles because it:

      a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.    Intentionally concealed the foregoing from the Plaintiffs; and/or

      c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

446.   Because Volkswagen fraudulently concealed the Defect in the Class Vehicles, resulting in a raft of negative publicity once the Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to the Class Vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

447.   Volkswagen's failures to disclose and active concealment of the dangers and risks posed by the Defect in the Class Vehicles were material to the Plaintiffs and the Georgia Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

448.   Plaintiff Leigh Glasband and the entire Georgia Sub-Class suffered ascertainable loss caused by Volkswagen's misrepresentations and its failure to disclose material information. Had they been aware of the Defect that existed in the Class Vehicles, and Volkswagen's complete disregard for safety, the Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. The Plaintiffs did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

449.   Volkswagen's violations present a continuing risk to the Plaintiff, Georgia Sub-Class members, as well as to the general public. After all, the Georgia Sub-Class members will continue to own and lease a vehicle with a Defect, will continue to be exposed to the dangers posed by cupped and uneven tires, and will continue to own and lease vehicles whose value is

diminished by the presence of the Defect.  Volkswagen's unlawful acts and practices complained of herein affect the public interest.

450.    As a direct and proximate result of Volkswagen's violations of the Georgia UDTPA, Plaintiff Leigh Glasband and the entire Georgia Sub-Class have suffered injury-in-fact and/or actual damage.

451.    Plaintiff, Leigh Glasband, and the other members of the Georgia Sub-Class seek an order enjoining Volkswagen's unfair, unlawful, and/or deceptive practices, costs, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per Ga. Code Ann. § 10-1-373.

### E.  Claims Brought on Behalf of the Louisiana Sub-Class

### COUNT 12

### Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law
### La. Rev. Stat. §§ 51:1401, *et seq.*

452.    This claim is brought only on behalf of Debbie Gray and the entire Louisiana Consumer Sub-Class against Volkswagen.

453.    Plaintiff Debbie Gray, the Louisiana Consumer Sub-Class, and Volkswagen are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8).

454.    The Plaintiff and the Louisiana Consumer Sub-Class are "consumers" within the meaning of the La. Rev. Stat. § 51:1402(1).

455.    Volkswagen engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(9).

456.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). Volkswagen participated in misleading, false, or deceptive acts that

violated the Louisiana CPL. By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles, Volkswagen engaged in deceptive business practices prohibited by Louisiana CPL.

457.    In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

458.    Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 2010 by way of numerous public and private complaints about the Defect and subsequent malfunctions.

459.    By failing to disclose and by actively concealing the Defect in the Class Vehicles, yet marketing them as safe, reliable, and of high quality, and by presenting itself as reputable seller that values safety, Volkswagen engaged in unfair or deceptive business practices in violation of the Louisiana CPL. To ensure that consumers would purchase and lease the Class Vehicles, Volkswagen deliberately withheld information about the propensity of the Defect to cause premature tire wear, irregular and dangerous driving performance, and a variety of other complications, instead of addressing the Defect to ensure the comfort and protection of the consumers and vehicle occupants.

460.    In the course of Volkswagen's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Defect discussed above.  Volkswagen compounded the deception by repeatedly asserting that the Class

Vehicles were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

461.    Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including the Plaintiffs, about the true safety and reliability of the Class Vehicles, the quality of Volkswagen's brand, and the true value of the Class Vehicles.

462.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead the entire the Plaintiffs and the Louisiana Sub-Class.

463.    Volkswagen knew or should have known that its conduct violated the Louisiana CPL.

464.    As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles that were either false or misleading.   Volkswagen's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite its knowledge of the Defect or its failure to adequately investigate it.

465.    To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers and risks posed by the Class Vehicles and their costly consequences, and allowed unsuspecting new and used car purchasers and lessees to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

466.    Volkswagen owed the Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles because Volkswagen:

      a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.   Intentionally concealed the foregoing from the Plaintiffs; and/or

      c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

467.   Because Volkswagen fraudulently concealed the Defect in the Class Vehicles, resulting in a cascade of negative publicity once the Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to the Class Vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

468.   Volkswagen's failure to disclose and active concealment of the dangers and risks posed by the Defect in the Class Vehicles were material to the Plaintiffs and the Louisiana Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

469.   Plaintiff Debbie Gray and the Louisiana Sub-Class suffered ascertainable loss caused by Volkswagen's misrepresentations and its failure to disclose material information. Had the Class Members been aware of the Defect that existed in the Class Vehicles and Volkswagen's complete disregard for safety, the Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. The Plaintiffs and the other Class Members did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

470.     Volkswagen's violations present a continuing risk to the Plaintiffs, the Louisiana Sub-Class, as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

471.     As a direct and proximate result of Volkswagen's violations of the Louisiana CPL, Plaintiff Debbie Gray and the Louisiana Sub-Class have suffered injury-in-fact and/or actual damage.

472.     Pursuant to La. Rev. Stat. § 51:1409, the Plaintiffs and the Louisiana Sub-Class seek to recover actual damages in an amount to be determined at trial; treble damages for Volkswagen's knowing violations of the Louisiana CPL; an order enjoining Volkswagen's unfair, unlawful, and/or deceptive practices; declaratory relief; costs; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

## COUNT 13

**Breach of the Implied Warranty of Merchantability/Warranty
Against Redhibitory Defects
La. Civ. Code Art. 2520, 2524**

473.     In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of Debbie Gray and the entire Louisiana Consumer Sub-Class against Volkswagen.

474.     At the time the Plaintiffs and the Louisiana Sub-Class acquired their Class Vehicles, those vehicles had a redhibitory defect within the meaning of La. Civ. Code Art. 2520, in that (a) the Class Vehicles were rendered so inconvenient that the Plaintiffs either would not have purchased the Class Vehicles had they known of the Defect, or, because the Defect so diminished the usefulness and/or value of the Class Vehicles such that it must be presumed that the Plaintiffs would not have purchased the Class Vehicles, but for a lesser price.

475.     No notice of the defect is required under La. Civ. Code Art. 2520, since Volkswagen had knowledge of the dangers and risks posed by the Class Vehicles at the time they were sold or leased to the Plaintiffs and the Louisiana Sub-Class.

476.     Under La. Civ. Code Art. 2524, a warranty that the Class Vehicles installed in them were in merchantable condition was implied by law in the Class Vehicle transactions.

477.     The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose of providing reliable, durable, and safe transportation. Specifically, they are inherently defective and dangerous in that the Defect: (a) causes tires to prematurely wear; (b) causes uneven wear on tires; (c) causes vehicles to uncontrollably pull to one side; (d) causes discomfort for vehicle occupants; (e) minimizes friction between tires and the road, jeopardizing steering stability and vehicle performance; (f) allows sudden oscillations in the vehicle when traveling on uneven surfaces; and (g) does not allow for necessary correction and adjustment of the Vehicles' front cambers.

478.     Volkswagen was provided notice of these issues by its knowledge of the issues, by consumer complaints, and by numerous individual letters and communications sent by the consumers.

479.     As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiff Debbie Gray and the Louisiana Sub-Class have been damaged in an amount to be proven at trial.

### F.  Claims Brought on Behalf of the Missouri Sub-Class

### COUNT 14

### Violation of the Missouri Merchandising Practices Act
### Mo. Rev. Stat. §§ 407.010 *et seq.*

480.    This claim is brought only on behalf of Mary Blue and the entire Missouri Consumer Sub-Class against Volkswagen.

481.    Plaintiff Mary Blue, the Missouri Sub-Class, and Volkswagen are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

482.    Volkswagen engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

483.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

484.    In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles as described herein.  By failing to disclose the Defect or facts about the Defect described herein known to them or that were available to Volkswagen upon reasonable inquiry, Volkswagen deprived consumers of all material facts about the safety and functionality of their vehicles.

485.    By failing to release material facts about the Defect, Volkswagen curtailed or reduced the ability of consumers to take notice of material facts about their vehicles, and/or it affirmatively operated to hide or keep those facts from consumers.  15 Mo. Code of Serv. Reg. § 60-9.110.

486.    Moreover, Volkswagen has otherwise engaged in activities with a tendency or capacity to deceive.   Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices, and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

487.    Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 201 by way of numerous public and private complaints about the Defect and subsequent malfunctions.

488.    By failing to disclose and by actively concealing the Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting itself as reputable manufacturers that value safety, Volkswagen engaged in unfair or deceptive business practices in violation of the Missouri MPA.   To ensure that consumers would purchase or lease the Class Vehicles, Volkswagen deliberately withheld the information about the propensity of the Defect to cause premature tire wear, irregular driving performance, and a variety of other complications, instead of addressing the Defect to ensure the comfort and protection of the consumers and vehicle occupants.

489.    In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

490.    Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to

create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including the Plaintiffs, about the true safety and reliability of the Class Vehicles, the quality of Volkswagen's brands, and the true value of the Class Vehicles.

491.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead the Plaintiffs and the Missouri Sub-Class, including, without limitation, by failing to disclose the Defect in light of circumstances under which the omitted facts were necessary in order to correct the assumptions, inferences or representations being made by Volkswagen about the safety or reliability of the Class Vehicles. Consequently, the failure to disclose such facts amounts to misleading statements pursuant to 15 Mo. Code of Serv. Reg. §60-9.090.

492.    Because Volkswagen knew or believed that its statements regarding safety and reliability of the Class Vehicles were not in accord with the facts and/or had no reasonable basis for such statements in light of its knowledge of the Defect, Volkswagen engaged in fraudulent misrepresentations pursuant to 15 Mo. Code of Serv. Reg.60-9.100.

493.    Volkswagen's conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers whose vehicles were inherently defective and dangerous in that the Defect: (a) causes tires to prematurely wear; (b) causes uneven wear on tires; (c) causes vehicles to uncontrollably pull to one side; (d) causes discomfort for vehicle occupants; (e) minimizes friction between tires and the road, jeopardizing steering stability and vehicle performance; (f) allows sudden oscillations in the vehicle when traveling on uneven surfaces; and (g) does not allow for necessary correction and adjustment of the Vehicles' front cambers. Such acts are unfair practices in violation of 15 Mo. Code of Serv. Reg. 60-8.020.

494.    Volkswagen knew or should have known that its conduct violated the Missouri MPA.

495.    As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles that were either false or misleading.   Volkswagen's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite its knowledge of the Defect or its failure to adequately investigate it.

496.    To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers and risks posed by the Class Vehicles and their costly consequences, and allowed unsuspecting new and used car purchasers and lessees to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

497.    Volkswagen owed the Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles because it:

       a.  Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

       b.  Intentionally concealed the foregoing from the Plaintiffs; and/or

       c.  Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

498.    Because Volkswagen fraudulently concealed the Defect in the Class Vehicles, resulting in a raft of negative publicity once the Defect finally began to be disclosed, the value of

the Class Vehicles has greatly diminished.  In light of the stigma attached to the Class Vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

499.    Volkswagen's failures to disclose and active concealment of the dangers and risks posed by the Defect in the Class Vehicles were material to the Plaintiffs and the Missouri Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

500.    Plaintiff Mary Blue and the entire Missouri Sub-Class suffered ascertainable loss caused by Volkswagen's misrepresentations and its failure to disclose material information. Had they been aware of the Defect that existed in the Class Vehicles, and Volkswagen's complete disregard for safety, the Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. The Plaintiffs did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

501.    Volkswagen's violations present a continuing risk to the Plaintiffs, to the Missouri Sub-Class, as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

502.    As a direct and proximate result of Volkswagen's violations of the Missouri MPA, Plaintiff Mary Blue and the entire Missouri Sub-Class have suffered injury-in-fact and/or actual damage.

503.    Volkswagen is liable to Plaintiff Mary Blue and the Missouri Sub-Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Volkswagen's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## COUNT 15

### Breach of the Implied Warranty of Merchantability
### Mo. Rev. Stat. § 400.2-314

504.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of Mary Blue and the entire Missouri Consumer Sub-Class against Volkswagen.

505.    Volkswagen is and was at all relevant times a merchant with respect to motor vehicles within the meaning of Mo. Rev. Stat. § 400.2-314(1).

506.    A warranty that the Class Vehicles were in merchantable condition was implied by law in the Class Vehicle transactions, pursuant to Mo. Rev. Stat. § 400.2-314.

507.    The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose of providing reliable, durable, and safe transportation. Specifically, they are inherently defective and dangerous in that the Defect: (a) causes tires to prematurely wear; (b) causes uneven wear on tires; (c) causes vehicles to uncontrollably pull to one side; (d) causes discomfort for vehicle occupants; (e) minimizes friction between tires and the road, jeopardizing steering stability and vehicle performance; (f) allows sudden oscillations in the vehicle when traveling on uneven surfaces; and (g) does not allow for necessary correction and adjustment of the Vehicles' front cambers.

508.    Volkswagen was provided notice of these issues by its knowledge of the issues, by customer complaints, and by numerous individual letters and communications sent by the consumers.

509.    As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiff Mary Blue and the entire Missouri Sub-Class have been damaged in an amount to be proven at trial.

### G.  Claims Brought on Behalf of the New Jersey Sub-Class

### COUNT 16

### Breach of Implied Warranty of Merchantability,
### N.J. Stat. Ann. § 12a:2-314

510.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of Matthew Martino and the entire New Jersey Consumer Sub-Class against Volkswagen.

511.    Volkswagen is a merchant with respect to motor vehicles.

512.    When Plaintiff Matthew Martino and the other members of the New Jersey Sub-Class purchased or leased their Class Vehicles, the transaction contained an implied warranty that the Class Vehicles were in merchantable condition.

513.    At the time of sale and all times thereafter, the Class Vehicles were not merchantable and not fit for the ordinary purpose of providing reliable, durable, and safe transportation.  Specifically, the Class Vehicles are inherently defective in that they are equipped with the Defect that, among other things, causes: (a) the Vehicles' tires to prematurely wear; (b) uneven wear on tires; (c) uncontrollable pulling to one side during operation; (d) discomfort for vehicle occupants; (e) minimization of friction between tires and the road, jeopardizing steering stability and vehicle performance; (f) sudden oscillations in the vehicle when traveling on uneven surfaces; and (g) obstruction to necessary corrections and adjustments of the Vehicles' front cambers.

514.    On information and belief, Volkswagen had notice of the Defect by its knowledge of the issues, by customer complaints, and by numerous individual letters and communications sent by the consumers.

515.    As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiff Matthew Martino and the entire New Jersey Consumer Sub-Class have been damaged in an amount to be proven at trial.

## COUNT 17

### Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.*

516.    This claim is brought only on behalf of Matthew Martino and the entire New Jersey Consumer Sub-Class against Volkswagen.

517.    Plaintiff Matthew Martino, the other New Jersey Sub-Class members, and Volkswagen are or were "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

518.    Volkswagen engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

519.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. Volkswagen engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that the New Jersey Sub-Class members rely upon its acts, concealment, suppression, or omissions.

116

520.    In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

521.    Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

522.    Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 2010 by way of numerous public and private complaints about the Defect and subsequent malfunctions.

523.    By failing to disclose and by actively concealing the Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting itself as reputable manufacturers that value safety, Volkswagen engaged in unfair or deceptive business practices in violation of the New Jersey CFA. To ensure that consumers would purchase and/or lease the Class Vehicles, Volkswagen deliberately withheld the information about the propensity of the Defect to cause premature tire wear, irregular driving performance, and a variety of other complications, instead of addressing the Defect to ensure the protection and comfort of the consumers and vehicle occupants.

524.    In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

525.    Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including the Plaintiffs, about the true safety and reliability of the Class Vehicles, the quality of Volkswagen's brands, and the true value of the Class Vehicles.

526.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intention to mislead the Plaintiffs and the New Jersey Consumer Sub-Class.

527.    Volkswagen knew or should have known that its conduct violated the New Jersey CFA.

528.    As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles that were either false or misleading. Volkswagen's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite its knowledge of the Defect or its failure to adequately investigate it.

529.    To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers and risks posed by the Class Vehicles and their costly consequences, and allowed unsuspecting new and used car purchasers and lessees to continue to buy/lease the Class Vehicles, and allowed them to continue driving these highly dangerous vehicles.

530.    Volkswagen owed the Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles because Volkswagen:

    a.  Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.  Intentionally concealed the foregoing from the Plaintiffs; and/or

    c.  Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

531.    Because Volkswagen fraudulently concealed the Defect in the Class Vehicles, resulting in a raft of negative publicity once the Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to the Class Vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

532.    Volkswagen's failures to disclose and active concealment of the dangers and risks posed by the Defect in the Class Vehicles were material to the Plaintiffs and the New Jersey Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Defect rather than promptly remedies them.

533.    Plaintiff Matthew Martino and the entire New Jersey Sub-Class suffered ascertainable loss caused by Volkswagen's misrepresentations and its failure to disclose material information. Had they been aware of the Defect that existed in the Class Vehicles, and Volkswagen's complete disregard for safety, the Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. The Plaintiffs did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

534.    Volkswagen's violations present a continuing risk to the Plaintiffs, the New Jersey Sub-Class, as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

535.    As a direct and proximate result of Volkswagen's violations of the New Jersey CFA, Plaintiff Matthew Martino and the entire New Jersey Sub-Class have suffered injury-in-fact and/or actual damage.

536.    Plaintiff Matthew Martino and the entire New Jersey Sub-Class are entitled to recover legal and/or equitable relief including an order enjoining Volkswagen's unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

## H.  <u>Claims Brought on Behalf of the New York Sub-Class</u>

### <u>COUNT 18</u>

**Violation of the New York General Business Law**
**N.Y. Gen. Bus. Law § 349**

537.    This claim is brought only on behalf of Carissa Macchione and the entire New York Consumer Sub-Class against Volkswagen.

538.    The Plaintiff, Carissa Macchione, and New York Sub-Class are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. Gen. Bus. Law § 349(h).

539.    Volkswagen is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

540.    The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Volkswagen's conduct directed

toward consumers, as described above and below, constitutes "deceptive acts or practices" within the meaning of the New York GBL.

541.     Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

542.     In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

543.     Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

544.     Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 2010 by way of numerous public and private complaints about the Defect and subsequent malfunctions.

545.     By failing to disclose and by actively concealing the Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that values safety, Volkswagen engaged in unfair or deceptive business practices in violation of the New York GBL. To ensure that consumers would purchase and/or lease the Class Vehicles, Volkswagen deliberately withheld the information about the propensity of the Defect to cause premature tire wear, irregular driving performance, and a variety of other complications, instead of addressing the Defect to ensure the comfort and protection of the consumers and vehicle occupants.

121

546.     In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

547.     Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including the Plaintiffs, about the true safety and reliability of the Class Vehicles, the quality of Volkswagen's brands, and the true value of the Class Vehicles.

548.     Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intention to mislead the Plaintiffs and the New York Sub-Class.

549.     Volkswagen knew or should have known that its conduct violated the New York GBL.

550.     As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles that were either false or misleading. Volkswagen's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite its knowledge of the Defect or its failure to adequately investigate it.

551.     To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers and risks posed by the Class Vehicles and their costly consequences, and allowed unsuspecting new and used car purchasers and lessees to

continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

552.    Volkswagen owed the Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles because Volkswagen:

   a.  Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

   b.  Intentionally concealed the foregoing from the Plaintiffs; and/or

   c.  Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

553.    Because Volkswagen fraudulently concealed the Defect in the Class Vehicles, resulting in a raft of negative publicity once the Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to the Class Vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

554.    Volkswagen's failure to disclose and active concealment of the dangers and risks posed by the Defect in the Class Vehicles were material to the Plaintiffs and the New York Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

555.    Plaintiff Carissa Macchione and the entire New York Sub-Class suffered ascertainable loss caused by Volkswagen's misrepresentations and its failure to disclose material information.  Had they been aware of the Defect that existed in the Class Vehicles, and Volkswagen's complete disregard for safety, the Plaintiffs either would have paid less for their

vehicles or would not have purchased or leased them at all.  The Plaintiffs did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

556.    Volkswagen's violations present a continuing risk to the Plaintiffs, the New York Sub-Class, as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

557.    As a direct and proximate result of Volkswagen's violations of the New York GBL, Plaintiff Carissa Macchione and the entire New York Sub-Class have suffered injury-in-fact and/or actual damage.

558.    Plaintiff Carissa Macchione and the New York Sub-Class members seek punitive damages against Volkswagen because its conduct was egregious. Volkswagen misrepresented the safety and reliability of several thousand Class Vehicles, concealed the Defect in several thousand of them, deceived the Plaintiffs and the New York Sub-Class on material matters, and concealed material facts that only Volkswagen knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in thousands of the Class Vehicles. Volkswagen's egregious conduct warrants punitive damages.

559.    As a result of the foregoing wrongful conduct of Volkswagen, Plaintiff Carissa Macchione and the entire New York Sub-Class seek recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining Volkswagen's deceptive conduct, and any other just and proper relief available under N.Y. Gen. Bus. Laws § 349.09.

## COUNT 19

### Violation of the New York General Business Law
### N.Y. Gen. Bus. Law § 350

560.     This claim is brought only on behalf of Carissa Macchione and the entire New York Consumer Sub-Class against Volkswagen.

561.     Volkswagen was and is engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

562.     N.Y. Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a

563.     Volkswagen caused to be made or disseminated through New York and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Volkswagen, to be untrue and misleading to consumers, including the Plaintiffs and the entire New York Sub-Class.

564.     Volkswagen has violated § 350 because the misrepresentations and omissions regarding the safety, reliability, and functionality of the Class Vehicles as set forth in this Amended Complaint were material and likely to deceive a reasonable consumer.

565.     Plaintiff Carissa Macchione and the entire New York Sub-Class have suffered an injury in fact, including the loss of money or property, as a result of Volkswagen's false advertising.  In purchasing or leasing the Class Vehicles with the Defect installed in them, the New York Plaintiffs and the New York Sub-Class relied on the misrepresentations and/or

omissions of Volkswagen with respect to the safety and reliability of the Class Vehicles. Volkswagen's representations were false and/or misleading because the concealed Defect and safety issues seriously undermine the value of the Class Vehicles.  Had the Plaintiffs and the New York Sub-Class known the truth, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

566.    Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiff Carissa Macchione and the entire New York Sub-Class seek monetary relief against Volkswagen measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each New York Sub-Class member.  Because Volkswagen's conduct was committed willfully and knowingly, the New York members are entitled to recover three times actual damages, up to $10,000, for each New York Class member.

567.    Plaintiff Carissa Macchione and the New York Sub-Class also seek an order enjoining Volkswagen's unfair, unlawful, and/or deceptive practices, costs, attorneys' fees, and any other just and proper relief available under General Business Law § 350.

## I.    Claims Brought on Behalf of the North Carolina Sub-Class

### COUNT 20

**Violation of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. §§ 75-1.1, *et seq.***

568.    This claim is brought only on behalf of Ryan Brown and the entire North Carolina Consumer Sub-Class against Volkswagen.

569.    Volkswagen engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

570.    The North Carolina Act broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). As alleged above and below, Volkswagen willfully committed unfair or deceptive acts or practices in violation of the North Carolina Act.

571.    In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

572.    Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

573.    Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 2010 by way of numerous public and private complaints about the Defect and subsequent malfunctions.

574.    By failing to disclose and by actively concealing the Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that values safety, Volkswagen engaged in unfair or deceptive business practices in violation of the North Carolina Act.  To ensure that consumers would purchase and lease the Class Vehicles, Volkswagen deliberately withheld the information about the propensity of the Defect to cause premature tire wear, irregular driving performance, and a variety of other complications, instead of addressing the Defect to ensure the comfort and protection of the consumers and vehicle occupants.

575.    In the course of Volkswagen's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect

discussed above. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

576.    Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including the Plaintiffs, about the true safety and reliability of the Class Vehicles, the quality of Volkswagen's brands, and the true value of the Class Vehicles.

577.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intention to mislead the Plaintiffs and the North Carolina Sub-Class.

578.    Volkswagen knew or should have known that its conduct violated the North Carolina Act.

579.    As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles that were either false or misleading.   Volkswagen's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite its knowledge of the Defect or its failure to adequately investigate it.

580.    To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers and risks posed by the Class Vehicles and their costly consequences, and allowed unsuspecting new and used car purchasers and lessees to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

581.   Volkswagen owed the Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles because it:

      a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.   Intentionally concealed the foregoing from the Plaintiffs; and/or

      c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

582.   Because Volkswagen fraudulently concealed the Defect in the Class Vehicles, resulting in a raft of negative publicity once the Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to the Class Vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

583.   Volkswagen's failures to disclose and active concealment of the dangers and risks posed by the Defect in the Class Vehicles were material to the Plaintiffs and the North Carolina Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

584.   Plaintiff Ryan Brown and the entire North Carolina Sub-Class suffered ascertainable loss caused by Volkswagen's misrepresentations and its failure to disclose material information. Had they been aware of the Defect that existed in the Class Vehicles and Volkswagen's complete disregard for safety, the Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. The Plaintiffs did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

585.    Volkswagen's violations present a continuing risk to the Plaintiffs, the North Carolina Sub-Class, as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

586.    As a direct and proximate result of Volkswagen's violations of the North Carolina Act, Plaintiff Ryan Brown and the entire North Carolina Sub-Class have suffered injury-in-fact and/or actual damage.

587.    Plaintiff Ryan Brown and the North Carolina Sub-Class members seek punitive damages against Volkswagen because Volkswagen's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

588.    Volkswagen fraudulently and willfully misrepresented the safety and reliability of the Class Vehicles, deceived North Carolina Sub-Class members on dangerous and material matters, and concealed material facts that only it knew, all to avoid the expense and public relations nightmare of correcting the myriad flaws in the Class Vehicles. Because Volkswagen's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith, it warrants punitive damages.

589.    The Plaintiffs and Sub-Class members seek an order for treble their actual damages, an order enjoining Volkswagen's unlawful acts, costs, attorneys' fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. § 75-16.

## J.    Claims Brought on Behalf of the Ohio Sub-Class

### COUNT 21

**Violation of the Consumer Sales Practices Act
Ohio Rev. Code §§ 1345.01, *et seq.***

590.    This claim is brought only on behalf of Nick Panopoulos and the entire Ohio Consumer Sub-Class against Volkswagen.

591.    Plaintiff Nick Panopoulos and the Ohio Sub-Class are "consumers" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchases and leases of the Class Vehicles were "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

592.    Volkswagen is a "supplier" as that term is defined in Ohio Rev. Code § 1345.01(C). The Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not. *Id.* Volkswagen's conduct as alleged above and below constitutes unfair and/or deceptive consumer sales practices in violation of Ohio Rev. Code § 1345.02.

593.    By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles, Volkswagen engaged in deceptive business practices prohibited by the Ohio CSPA, including: representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not; and engaging in other unfair or deceptive acts or practices.

594.    Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

595.     In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

596.     Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

597.     Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 2010 by way of numerous public and private complaints about the Defect and subsequent malfunctions.

598.     By failing to disclose and by actively concealing the Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that values safety, Volkswagen engaged in unfair or deceptive business practices in violation of the Ohio CSPA. To ensure that consumers would purchase and/or lease the Class Vehicles, Volkswagen deliberately withheld the information about the propensity of the Defect to cause premature tire wear, irregular driving performance, and a variety of other complications, instead of addressing the Defect to ensure the comfort and protection of the consumers and vehicle occupants.

599.     In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

600.    Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including the Plaintiffs, about the true safety and reliability of the Class Vehicles, the quality of Volkswagen's brands, and the true value of the Class Vehicles.

601.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intention to mislead the Plaintiffs and the Ohio Sub-Class.

602.    Volkswagen knew or should have known that its conduct violated the Ohio CSPA.

603.    As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles that were either false or misleading.  Volkswagen's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite its knowledge of the Defect or its failure to adequately investigate it.

604.    To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers and risks posed by the Class Vehicles and their costly consequences, and allowed unsuspecting new and used car purchasers and lessees to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

605.    Volkswagen owed the Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles because Volkswagen:

d.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

e.   Intentionally concealed the foregoing from the Plaintiffs; and/or

f.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

606.   Because Volkswagen fraudulently concealed the Defect in the Class Vehicles, resulting in a raft of negative publicity once the Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to the Class Vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

607.   Volkswagen's failure to disclose and active concealment of the dangers and risks posed by the Defect in the Class Vehicles were material to the Plaintiffs and the Ohio Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

608.   Plaintiff Nick Panopoulos and the entire Ohio Sub-Class suffered ascertainable loss caused by Volkswagen's misrepresentations and its failure to disclose material information. Had they been aware of the Defect that existed in the Class Vehicles, and Volkswagen's complete disregard for safety, the Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. The Plaintiffs did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

609.   Volkswagen's violations present a continuing risk to the Plaintiffs, the Ohio Sub-Class, as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

610.    As a direct and proximate result of Volkswagen's violations of the Ohio CSPA, Plaintiff Nick Panopoulos and the entire Ohio Sub-Class have suffered injury-in-fact and/or actual damage.

611.    Plaintiff Nick Panopoulos and the Ohio Sub-Class members seek punitive damages against Volkswagen because its conduct was egregious. Volkswagen misrepresented the safety and reliability of several thousand Class Vehicles, concealed the Defect in several thousand of them, deceived the Ohio Sub-Class on material matters, and concealed material facts that only Volkswagen knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in thousands of the Class Vehicles.  Volkswagen's egregious conduct warrants punitive damages.

612.    As a result of the foregoing wrongful conduct of Volkswagen, Plaintiff Nick Panopoulos and the entire Ohio Sub-Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Volkswagen's deceptive and unfair conduct, treble damages, court costs and reasonable attorneys' fees, pursuant to Ohio Rev. Code § 1345.09, *et seq.*

### K.  Claims Brought on Behalf of the Pennsylvania Sub-Class

### COUNT 22

**Violation of the Unfair Trade Practices and Consumer Protection Law**
**Pa. Stat. Ann. §§ 201-1,** *et seq.*

613.    This claim is brought only on behalf of Teresa Garella and the entire Pennsylvania Consumer Sub-Class against Volkswagen.

614.    The Plaintiffs purchased or leased their Class Vehicles containing the Defect primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

615.    All of the acts complained of herein were perpetrated by Volkswagen in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

616.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, … benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

617.    Volkswagen engaged in unlawful trade practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

618.    In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

619.    Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

620.     Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 2010 by way of numerous public and private complaints about the Defect and subsequent malfunctions.

621.     By failing to disclose and by actively concealing the Defect in the Class Vehicles, by marketing the Class Vehicles as safe, reliable, and of high quality, and by presenting itself as reputable manufacturers that value safety, Volkswagen engaged in unfair or deceptive business practices in violation of the Pennsylvania CPL. To ensure that consumers would purchase and/or lease the Class Vehicles, Volkswagen deliberately withheld the information about the propensity of the Defect to cause premature tire wear, irregular driving performance, and a variety of other complications, instead of addressing the Defect to ensure the protection and comfort of the consumers and vehicle occupants.

622.     In the course of Volkswagen's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

623.     Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including the Plaintiffs, about the true safety and reliability of the Class Vehicles, the quality of Volkswagen's brands, and the true value of the Class Vehicles.

624.     Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intention to mislead the Plaintiffs and the Pennsylvania Sub-Class.

625.    Volkswagen knew or should have known that its conduct violated the Pennsylvania CPL.

626.    As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles that were either false or misleading. Volkswagen's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable despite its knowledge of the Defect or its failure to adequately investigate it.

627.    To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers and risks posed by the Class Vehicles and their costly consequences, and allowed unsuspecting new and used car purchasers and lessees to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

628.    Volkswagen owed the Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles because Volkswagen:

a.  Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.  Intentionally concealed the foregoing from the Plaintiffs; and/or

c.  Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

629.    Because Volkswagen fraudulently concealed the Defect in the Class Vehicles, resulting in a raft of negative publicity once the Defect finally began to be disclosed, the value of

the Class Vehicles has greatly diminished. In light of the stigma attached to the Class Vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

630.    Volkswagen's failure to disclose and active concealment of the dangers and risks posed by the Defect in the Class Vehicles were material to the Plaintiffs and the Pennsylvania Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

631.    Plaintiff Teresa Garella and the entire Pennsylvania Sub-Class suffered ascertainable loss caused by Volkswagen's misrepresentations and their failure to disclose material information. Had they been aware of the Defect that existed in the Class Vehicles, and Volkswagen's complete disregard for safety, the Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. The Plaintiffs did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

632.    Volkswagen's violations present a continuing risk to the Plaintiffs, the Pennsylvania Sub-Class, as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

633.    As a direct and proximate result of Volkswagen's violations of the Pennsylvania CPL, Plaintiff Teresa Garella and the entire Pennsylvania Sub-Class have suffered injury-in-fact and/or actual damage.

634.    Volkswagen is liable to Plaintiff Teresa Garella and the Pennsylvania Sub-Class for treble their actual damages or $100.00, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiff Teresa Garella and the Pennsylvania Sub-Class are also entitled to an

award of punitive damages given that Volkswagen's conduct was malicious, wanton, willful, oppressive, and/or exhibited a reckless indifference to the rights of others.

## COUNT 23

### Breach of the Implied Warranty of Merchantability
### 13 PA. Stat. Ann. §2314

635.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of Teresa Garella and the entire Pennsylvania Consumer Sub-Class against Volkswagen.

636.    Volkswagen is and was at all relevant times a merchant with respect to motor vehicles within the meaning of 13 Pa. Stat. Ann. § 2104.

637.    A warranty that the Class Vehicles were in merchantable condition was implied by law in the Class Vehicle transactions, pursuant to 13 Pa. Stat. Ann. § 2314.

638.    The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purposes of providing reliable, durable, and safe transportation. Specifically, they are inherently defective and dangerous in that the Defect: (a) causes tires to prematurely wear; (b) causes uneven wear on tires; (c) causes vehicles to uncontrollably pull to one side; (d) causes discomfort for vehicle occupants; (e) minimizes friction between tires and the road, jeopardizing steering stability and vehicle performance; (f) allows sudden oscillations in the vehicle when traveling on uneven surfaces; and (g) does not allow for necessary correction and adjustment of the Vehicles' front cambers.

639.    Volkswagen was provided notice of these issues by its knowledge of the issues, by customer complaints, and by numerous individual letters and communications sent by the consumers.

640.     As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiff Teresa Garella and the entire Pennsylvania Sub-Class have been damaged in an amount to be proven at trial.

**L.   Claims Brought on Behalf of the Texas Sub-Class**

**COUNT 24**

**Violation of the Deceptive Trade Practices Act**
**Tex. Bus. & Com. Code §§ 17.41, *et seq.***

641.     This claim is brought only on behalf of Thomas Wilson, Jorge Cruz and the entire Texas Consumer Sub-Class against Defendants, Volkswagen.

642.     Thomas Wilson, Jorge Cruz and the Texas Sub-Class are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* Tex. Bus. & Com. Code § 17.41.

643.     The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code § 17.45(5); Tex. Bus. & Com. Code § 17.50(a)(3). Volkswagen has committed false, misleading, unconscionable, and deceptive acts or practices in the conduct of trade or commerce.

644.     By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles, Volkswagen engaged in deceptive business practices prohibited by the Texas DTPA, including: representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and

grade when they are not; advertising them with the intent not to sell or lease them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

645.    In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

646.    Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

647.    Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 2010 by way of numerous public and private complaints about the Defect and subsequent malfunctions.

648.    By failing to disclose and by actively concealing the Defect in the Class Vehicles, by marketing the Class Vehicles as safe, reliable, and of high quality, and by presenting itself as reputable manufacturers that value safety, Volkswagen engaged in unfair or deceptive business practices in violation of the Texas DTPA. To ensure that consumers would purchase and/or lease the Class Vehicles, Volkswagen deliberately withheld the information about the propensity of the Defect to cause premature tire wear, irregular driving performance, and a variety of other complications, instead of addressing the Defect to ensure the protection and comfort of the consumers and vehicle occupants.

649.    In the course of Volkswagen's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect

discussed above. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

650.    Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including the Plaintiffs, about the true safety and reliability of Class Vehicles, the quality of Volkswagen's brands, and the true value of the Class Vehicles.

651.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intention to mislead the Plaintiffs and the Texas Sub-Class.

652.    Volkswagen knew or should have known that its conduct violated the Texas DTPA.

653.    As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles that were either false or misleading. Volkswagen's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite its knowledge of the Defect or its failure to reasonably investigate it.

654.    To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers and risks posed by the Class Vehicles and their costly consequences, and allowed unsuspecting new and used car purchasers and lessees to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

655.    Volkswagen owed the Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles because Volkswagen:

   a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

   b.   Intentionally concealed the foregoing from the Plaintiffs; and/or

   c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

656.    Because Volkswagen fraudulently concealed the Defect in Class Vehicles, resulting in a raft of negative publicity once the Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

657.    Volkswagen's failure to disclose and active concealment of the dangers and risks posed by the Defect in Class Vehicles were material to the Plaintiffs and the Texas Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

658.    Plaintiffs Thomas Wilson and Jorge Cruz, and the entire Texas Sub-Class suffered ascertainable loss caused by Volkswagen's misrepresentations and its failure to disclose material information. Had they been aware of the Defect that existed in the Class Vehicles, and Volkswagen's complete disregard for safety, the Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. The Plaintiffs did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

659.    Volkswagen's violations present a continuing risk to the Plaintiffs, the Texas Sub-Class, as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

660.    As a direct and proximate result of Volkswagen's violations of the Texas DTPA, Plaintiffs Thomas Wilson and Jorge Cruz, and the entire Texas Sub-Class have suffered injury-in-fact and/or actual damage.

661.    Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1) and (b), the Plaintiffs and the Texas Sub-Class seek monetary relief against Volkswagen measured as actual damages in an amount to be determined at trial, treble damages for Volkswagen's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA. The Plaintiffs and the Texas Sub-Class also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

662.    In accordance with Tex. Bus. & Com. Code § 17.505(a), Plaintiffs' counsel, on behalf of the Plaintiffs, served Volkswagen with notice of its alleged violations of the Texas DTPA relating to the Class Vehicles purchased by the Plaintiffs and the Texas Sub-Class, and demanded that Volkswagen correct or agree to correct the actions described therein. If Volkswagen fails to do so, the Plaintiffs will amend this Amended Complaint as of right (or otherwise seek leave to amend this Amended Complaint) to include compensatory and monetary damages to which the Plaintiffs and the Class Members are entitled.

## COUNT 25

### Breach of the Implied Warranty of Merchantability
### Tex. Bus. & Com. Code § 2.314

663.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of Thomas Wilson, Jorge Cruz, and the entire Texas Consumer Sub-Class against Defendants, Volkswagen.

664.    Volkswagen is and was at all relevant times a merchant with respect to motor vehicles within the meaning of Tex. Bus. & Com. Code § 2.104.

665.    A warranty that the Class Vehicles were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Tex. Bus. & Com. Code § 2.314.

666.    Volkswagen impliedly warranted that the Class Vehicles, which Volkswagen designed, manufactured, sold, and/or leased, were merchantable, fit for the ordinary purposes for which they were intended to be used, and were not otherwise injurious to consumers and their vehicles. The ordinary purpose for which the Class Vehicles are used is, among other things, to drive and operate in a manner that does not unnecessarily and unreasonably damage the vehicle and expose its owners, occupants, and nearby motorists to needless damage, harm, and risk.

667.    Volkswagen breached the implied warranty when it designed, manufactured, distributed, sold and leased the Class Vehicles. The Class Vehicles, when sold or leased and at all times thereafter, were not merchantable or fit for the ordinary purpose of providing reliable, durable, and safe transportation. Specifically, they are defective and dangerous in that the Defect: (a) causes tires to prematurely wear; (b) causes uneven wear on tires; (c) causes vehicles to uncontrollably pull to one side; (d) causes discomfort for vehicle occupants; (e) minimizes friction between tires and the road, jeopardizing steering stability and vehicle performance; (f)

allows sudden oscillations in the vehicle when traveling on uneven surfaces; and (g) does not allow for necessary correction and adjustment of the Vehicles' front cambers.

668.    Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 2010 by way of numerous public and private complaints about the Defect and subsequent malfunctions.

669.    As a direct and proximate result of Volkswagen's breach of the warranties of merchantability and fitness for a particular purpose, Plaintiffs Thomas Wilson, Jorge Cruz, and the entire Texas Consumer Sub-Class have been damaged in an amount to be proven at trial.

### M. Claims Brought on Behalf of the Utah Sub-Class

### COUNT 26

**Violation of the Utah Consumer Sales Practices Act**
**Utah Code Ann. §§ 13-11-1 *et seq.***

670.    This claim is brought only on behalf of Ismael Orrantia and the entire Utah Consumer Sub-Class against Defendants, Volkswagen.

671.    Plaintiff Ismael Orrantia and the Utah Consumer Sub-Class are "consumers" within the meaning of the Utah Consumer Sales Practices Act ("UCSPA"), and their purchases and leases of the Class Vehicles were "consumer transactions" as that term is defined in Utah Code Ann. § 13-11-3(2).

672.    Volkswagen is a "supplier" as that term is defined in Utah Code Ann. § 13-11-3(6). The Utah UCSPA broadly prohibits deceptive and unconscionable acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Utah UCSPA prohibits suppliers from representing: (a) "that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not;" (b) "that the subject of a consumer transaction of a particular standard,

quality, grade, style, or model, if it is not;" and (e) "that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not."

673.    By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles, Volkswagen engaged in deceptive business practices prohibited by the Utah UCSPA, including: representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not; and engaging in other unfair or deceptive acts or practices.

674.    Volkswagen's actions as set forth above occurred in the conduct of trade or commerce.

675.    In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

676.    Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

677.    Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 2010 by way of numerous public and private complaints about the Defect and subsequent malfunctions.

678.    By failing to disclose and by actively concealing the Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting itself as a reputable

manufacturer that values safety, Volkswagen engaged in unfair or deceptive business practices in violation of the Utah UCSPA. To ensure that consumers would purchase and/or lease the Class Vehicles, Volkswagen deliberately withheld the information about the propensity of the Defect to cause premature tire wear, irregular driving performance, and a variety of other complications, instead of addressing the Defect to ensure the comfort and protection of the consumers and vehicle occupants.

679.    In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

680.    Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including the Plaintiffs, about the true safety and reliability of the Class Vehicles, the quality of Volkswagen's brands, and the true value of the Class Vehicles.

681.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intention to mislead the Plaintiffs and the Utah Sub-Class.

682.    Volkswagen knew or should have known that its conduct violated the Utah UCSPA.

683.    As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles that were either false or misleading. Volkswagen's representations, omissions, statements, and commentary have included selling and marketing the

Class Vehicles as safe and reliable, despite its knowledge of the Defect or its failure to adequately investigate it.

684.    To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers and risks posed by the Class Vehicles and their costly consequences, and allowed unsuspecting new and used car purchasers and lessees to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

685.    Volkswagen owed the Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles because Volkswagen:

      a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.    Intentionally concealed the foregoing from the Plaintiffs; and/or

      c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

686.    Because Volkswagen fraudulently concealed the Defect in the Class Vehicles, resulting in a raft of negative publicity once the Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to the Class Vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

687.    Volkswagen's failure to disclose and active concealment of the dangers and risks posed by the Defect in the Class Vehicles were material to the Plaintiffs and the Utah Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise

comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

688.    Plaintiff Ismael Orrantia and the entire Utah Sub-Class suffered ascertainable loss caused by Volkswagen's misrepresentations and its failure to disclose material information. Had they been aware of the Defect that existed in the Class Vehicles, and Volkswagen's complete disregard for safety, the Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. The Plaintiffs did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

689.    Volkswagen's violations present a continuing risk to the Plaintiffs, the Utah Sub-Class, as well as to the general public. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

690.    As a direct and proximate result of Volkswagen's violations of the Utah UCSPA, Plaintiff Ismael Orrantia and the entire Utah Sub-Class have suffered injury-in-fact and/or actual damage.

691.    As a result of the foregoing wrongful conduct of Volkswagen, Plaintiff Ismael Orrantia and the entire Utah Sub-Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Volkswagen's deceptive and unfair conduct, costs, and reasonable attorneys' fees, pursuant to Utah Code Ann. § 13-11-1 *et seq.*

## COUNT 27

**Breach of Implied Warranty of Merchantability**
**Utah Code Ann. § 70A-2-314**

692.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of Ismael Orrantia and the entire Utah Consumer Sub-Class against Volkswagen.

693.    Volkswagen is and was at all relevant times a merchant with respect to motor vehicles within the meaning of Utah Code Ann. § 70A-2-314.

694.    A warranty that the Class Vehicles were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Utah Code Ann. § 70A-2-314.

695.    Volkswagen impliedly warranted that the Class Vehicles, which Volkswagen designed, manufactured, sold, and/or leased, were merchantable, fit for the ordinary purposes for which they were intended to be used, and were not otherwise injurious to consumers and their vehicles. The ordinary purpose for which the Class Vehicles are used is, among other things, to drive and operate in a manner that does not unnecessarily and unreasonably damage the vehicle and expose its owners, occupants, and nearby motorists to needless damage, harm, and risk.

696.    Volkswagen breached the implied warranty when it designed, manufactured, distributed, sold and leased the Class Vehicles. The Class Vehicles, when sold or leased and at all times thereafter, were not merchantable or fit for the ordinary purpose of providing reliable, durable, and safe transportation. Specifically, they are defective and dangerous in that the Defect: (a) causes tires to prematurely wear; (b) causes uneven wear on tires; (c) causes vehicles to uncontrollably pull to one side; (d) causes discomfort for vehicle occupants; (e) minimizes friction between tires and the road, jeopardizing steering stability and vehicle performance; (f) allows sudden oscillations in the vehicle when traveling on uneven surfaces; and (g) does not allow for necessary correction and adjustment of the Vehicles' front cambers.

697.    Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 2010 by way of numerous public and private complaints about the Defect and subsequent malfunctions.

698.    As a direct and proximate result of Volkswagen's breach of the warranties of merchantability and fitness for a particular purpose, Plaintiff Ismael Orrantia and the entire Utah Consumer Sub-Class have been damaged in an amount to be proven at trial.

### N.  **Claims Brought on Behalf of the Virginia Sub-Class**

### COUNT 28

**Violation of the Virginia Consumer Protection Act**
**Va. Code Ann. §§ 59.1-196, *et seq.***

699.    This claim is brought only on behalf of Sydnee Johnson and the entire Virginia Consumer Sub-Class against Volkswagen.

700.    Volkswagen is a "supplier" as that term is defined in Va. Code Ann. § 59.1-198.

701.    The purchases and leases of the Class Vehicles were "consumer transactions" within meaning of  Va. Code Ann. § 59.1-198.

702.    The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices" which include: "5. Misrepresenting that good or services have certain characteristics;" "6. Misrepresenting that goods or services are of a particular standard, quality, grade style, or model;" "8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;" "9. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "14. Using any other deception, fraud, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200. Volkswagen violated the Virginia CPA by misrepresenting that the Class Vehicles had certain quantities, characteristics, ingredients, uses,

or benefits; misrepresenting that they were of a particular standard, quality, and grade when they are not; advertising them with intent not to sell or lease them as advertised; and otherwise "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

703.    In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

704.    Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

705.    Volkswagen and its network of authorized dealers have been aware of the existence of the Defect and its potential dangers since at least 2010 by way of numerous public and private complaints about the Defect and subsequent malfunctions.

706.    By failing to disclose and by actively concealing the Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that values safety, Volkswagen engaged in unfair or deceptive business practices in violation of the Virginia CPA. To ensure that consumers would purchase and/or lease the Class Vehicles, Volkswagen deliberately withheld the information about the propensity of the Defect to cause premature tire wear, irregular driving performance, and a variety of other complications, instead of addressing the Defect to ensure the comfort and protection of the consumers and vehicle occupants.

707.    In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

708.    Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including the Plaintiffs, about the true safety and reliability of Class Vehicles, the quality of Volkswagen's brands, and the true value of the Class Vehicles.

709.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intention to mislead the Plaintiffs and the Virginia Sub-Class.

710.    Volkswagen knew or should have known that its conduct violated the Virginia CPA.

711.    As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles that were either false or misleading. Volkswagen's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite its knowledge of the Defect or its failure to adequately investigate it.

712.    To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers and risks posed by the Class Vehicles and their costly consequences, and allowed unsuspecting new and used car purchasers and lessees to

continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

713.    Volkswagen owed the Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles because Volkswagen:

      a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.   Intentionally concealed the foregoing from the Plaintiffs; and/or

      c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Plaintiffs that contradicted these representations.

714.    Because Volkswagen fraudulently concealed the Defect in Class Vehicles, resulting in a cascade of negative publicity once the Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

715.    Volkswagen's failure to disclose and active concealment of the dangers and risks posed by the Defect in Class Vehicles were material to the Plaintiffs and the Virginia Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

716.    Plaintiff Sydnee Johnson, and the Virginia Sub-Class suffered ascertainable loss caused by Volkswagen's misrepresentations and its failure to disclose material information. Had the Class Members been aware of the Defect that existed in the Class Vehicles and Volkswagen's complete disregard for safety, the Plaintiffs either would have paid less for their

vehicles or would not have purchased or leased them at all. The Plaintiffs and the other Class Members did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

717.    Volkswagen's violations present a continuing risk to the Plaintiff, Virginia Sub-Class members, as well as to the general public. After all, the Plaintiff, Virginia Sub-Class members, will continue to own and lease a vehicle with an Defect and will continue to be exposed to the dangers posed by cupped and uneven tires, and will continue to own and lease vehicles whose value is diminished by the presence of the Defect. Volkswagen's unlawful acts and practices complained of herein affect the public interest.

718.    As a direct and proximate result of Volkswagen's violations of the Virginia CPA, Plaintiff Sydnee Johnson and the entire Virginia Sub-Class have suffered injury-in-fact and/or actual damage.

719.    Pursuant to Va. Code Ann. § 59.1-204, the Plaintiffs and the Virginia Sub-Class seek monetary relief against Volkswagen measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Virginia Sub-Class member. Because Volkswagen's conduct was committed willfully and knowingly, the Plaintiffs are entitled to recover, for each Plaintiff and each Virginia Sub-Class member, the greater of (a) three times actual damages or (b) $1,000.

720.    The Plaintiffs and the Sub-Class members seek an order enjoining Volkswagen's unfair, unlawful, and/or deceptive practices, costs, attorneys' fees, and any other just and proper relief available under General Business Law § 59.1-204, *et seq.*

### COUNT 29

**Breach of the Implied Warranty of Merchantability**
**Va. Code Ann. § 8.2-314**

721.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of Sydnee Johnson and the entire Virginia Consumer Sub-Class against Defendants, Volkswagen.

722.    Volkswagen is and was at all relevant times a merchant with respect to motor vehicles within the meaning of Va. Code Ann. § 8.2-314.

723.    A warranty that the Class Vehicles were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Va. Code Ann. § 8.2-314.

724.    The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose of providing reliable, durable, and safe transportation. Specifically, they are inherently defective and dangerous in that the Defect: (a) causes tires to prematurely wear; (b) causes uneven wear on tires; (c) causes vehicles to uncontrollably pull to one side; (d) causes discomfort for vehicle occupants; (e) minimizes friction between tires and the road, jeopardizing steering stability and vehicle performance; (f) allows sudden oscillations in the vehicle when traveling on uneven surfaces; and (g) does not allow for necessary correction and adjustment of the Vehicles' front cambers.

725.    Volkswagen was provided notice of these issues by its knowledge of the issues, by customer complaints, and by numerous individual letters and communications sent by the consumers.

726.    As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiff Sydnee Johnson and the entire Virginia Sub-Class have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

727.   The Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that the Court enter judgment against Volkswagen as follows:

728.   An order certifying the proposed Classes, designating the Plaintiffs as the named representatives of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class Members as the Court deems appropriate, under Fed. R. Civ. P. 23.

729.   A declaration that the Class Vehicles contain the Defect;

730.   A declaration that Volkswagen is financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

731.   An order enjoining Volkswagen to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and such other injunctive relief that the Court deems just and proper;

732.   An award to the Plaintiffs and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

733.   An award to the Plaintiffs and the Class Members for the return of the purchase or lease prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages, and for reasonable attorney fees;

734.   A declaration that Volkswagen must disgorge, for the benefit of the Plaintiffs and the Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles, or make full restitution to the Plaintiffs and the Class Members;

735.   An award of attorneys' fees and costs, as allowed by law;

736. An award of prejudgment and post judgment interest, as provided by law;

737. Leave to amend this Amended Complaint to conform to the evidence produced at trial; and

738. Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED: November 20, 2017

**PODHURST ORSECK, P.A.**

*/s/ Roy K. Altman*
Roy K. Altman
Bar No.: 116885
raltman@podhurst.com
One SE 3rd Avenue, Suite 2700
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382

**KREHER & TRAPANI, LLP**

*/s/ Francesco P. Trapani*
Francesco P. Trapani, Esq.
frank@krehertrapani.com
1325 Spruce St.
Philadelphia, PA 19107
Phone: (215) 907-7290
Fax: (215) 907-7287
*Pro Hac Vice* pending

**POGUST BRASLOW & MILLROOD, LLC**

*/s/ Harris Pogust*
Harris Pogust, Esq.
HPogust@pbmattorneys.com
Eight Tower Bridge, Suite 940
161 Washington Street
Conshohocken, PA 19428
Phone: (610) 941-4204

160

Fax: (610) 941-4245
*Pro Hac Vice* pending